**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

Patrice Pitts et al.,                )

                                )

          Plaintiffs.         )

                                )

v.                             )

                                )     Case No.  1:14-cv-1319 (TSC)

THE DISTRICT OF COLUMBIA, et al.   )

                                )

          Defendants.     )

## RESPONSE IN OPPOSITION TO MOTION TO DISMISS

## TABLE OF CONTENTS

I.  The Invalidity of the Search Warrant…………………………….…………….…...……...2

   A.  The Warrant Application Obviously Lacked Probable Cause…………..……….…......3

      1.  Probable Cause Requires Specific Facts Connecting the Place to
         Be Searched to Criminal Activity……………..………..……………………….……4

      2.  There Is No Fourth Amendment Exception for the Category of People
         Who Are Gun Possessors...…………………….....................................................10

      3.  The Warrant Application So Lacked Probable Cause that Reliance on the
         Application Was Not Objectively Reasonable……………………………..….…13

   B.  The Application Relies on False and Misleading Statements and Omissions………....15

      1.  The False and Misleading Statements of "Training" and "Experience"……..……16

   C.  The Warrant Improperly Relied on Information Obtained in
      Unconstitutional and Illegal Searches and Seizures……..……………..…….…….…23

      1.  The Defendants Misunderstand the Law Applicable to the Plaintiffs' Claims……..23

      2.  The Illegal Search and Seizure of Tyrone Pitts……………………...………………27

II.  The Unreasonable Conduct of the Defendants During the Search………………………..…29

   A.  The Failure to Knock and Announce……...…………………………….…….……29

B.  The Unlawful Strip Search of Michael Pitts's Genitals…………………………………35

C.  The Unlawful and Extended Search for Drugs………………………………..……....…38

D.  Illegal and Extended Handcuffing of the Disabled Patrice Pitts and Michael Pitts..……38

E.  The Brutal and Repeated Seizures, Searches, and Taunts Shock the Conscience………43

III.    Municipal Liability …………………………………….………………………….....43

IV.    Conclusion……………………………………………………………………………....44

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |
|---|---|
| Patrice Pitts et al., | ) |
|  | ) |
| Plaintiffs. | ) |
|  | ) |
| v. | ) |
|  | ) Case No.  1:14-cv-1319 (TSC) |
| THE DISTRICT OF COLUMBIA, et al. | ) |
|  | ) |
| Defendants. | ) |
| _____ | ) |

## RESPONSE IN OPPOSITION TO MOTION TO DISMISS

This case raises important and systemic issues of police misconduct in seeking and executing search warrants in the District of Columbia.  The Plaintiffs allege the widespread use of facially insufficient, false, and misleading statements of "training" and "experience" in MPD warrant applications, the deliberate attempt to hide from a state-court judicial officer illegal police activity on which the warrant application in this case was based, and a series of brutal, outrageous, and unreasonable actions by government employees when they arrived at the Plaintiffs' home.  These questions are of particular importance for African American families in D.C. who, despite making up less than half of the District's population, are the subject of well over nine out of every ten "training" and "experience" based home raids in the city.

The Defendants' Motion to Dismiss, Doc. 7, rewrites and confuses the Plaintiffs' allegations, misunderstands the law applicable to several of the Plaintiffs' claims, and either misrepresents or ignores dispositive factual issues.  Taken as a whole, the Defendants' Motion puts forward a chilling and dangerous vision of municipal government power—one that is inconsistent with longstanding constitutional principles requiring particularized and truthful justifications for serious state intrusions into private lives.  The Motion should be denied.

1

## I.        The Invalidity of the Search Warrant

For over two hundred years, "the central concern underlying the Fourth Amendment" has been ensuring that police officers do not have "unbridled discretion to rummage at will among a person's private effects." *Arizona v. Gant*, 556 U.S. 332, 345 (2009).  The comprehensive search of a person's private home has long been viewed as among the most intrusive and exceptional acts of government power, even before those searches became heavily militarized.  *Illinois v. Rodriguez*, 497 U.S. 177, 191 (1990) ("[T]he physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.") (quotations omitted); *Wolf v. Colorado*, 338 U.S. 25, 27-28 (1949) ("The security of one's privacy against arbitrary intrusion by the police—which is at the core of the Fourth Amendment—is basic to a free society.").  At a minimum, a search warrant means agents of the government entering a private home and examining a person or a family's most intimate writings and belongings, collected over and documenting a lifetime of experiences.   Often, as in this case, it means much more.

As a result, government employees seeking to enter a private home and to inspect a family's most personal possessions are required to present a sworn affidavit setting forth good reasons to justify that intrusion.  Once police secure a valid warrant, officers are ordinarily not liable if they rely on the warrant to search a home.  *United States v. Leon*, 468 U.S. 897 (1984).  *Leon* protects police officers so long as they act in good faith and with objective reasonableness.  However, police officers must still exercise "reasonable professional judgment," *Malley v. Briggs*, 475 U.S. 335, 346 (1986), and, because "it is possible that a magistrate, working under docket pressures, will fail to perform as a magistrate should," police officers will be held liable if their reliance is not reasonable.  *Id*.  *Malley* therefore adopted the "objective reasonableness" rule of *Leon* as the same rule governing whether police officers are entitled to qualified immunity in civil cases.  *Id*.

There are important circumstances under *Leon* and *Malley* in which police reliance on a warrant is not acceptable. 468 U.S. at 923. These circumstances include warrant applications that are so lacking in evidence of probable cause that reliance on them is unreasonable, *see id.*; instances in which the warrant relied on false information or the issuing judge was misled by the omission of material information, *see Franks v. Delaware*, 438 U.S. 154, 165 (1978); and warrant applications that are themselves based on the fruits of unconstitutional police conduct, *see Murray v. United States*, 487 U.S. 533, 540 (1988).

All of these circumstances apply in this case: (1) Defendant Pugh's warrant application was so lacking in probable cause on its face that no reasonable officer would have relied on it, (2) the warrant application relied on false information and omitted material information, and (3) the warrant application was based on the fruits of unlawful police conduct.

**A.  The Warrant Application Obviously Lacked Probable Cause**

Searches of a person's body incident to an arrest are now well accepted in American policing. However, the question of whether the District's police can quietly create a radical new policy of "searches of entire homes incident to arrest" deserves much more critical analysis. This case raises the question whether, by virtue of an opinion offered by an officer about the habits of all illegal "gun possessors," Doc. 1-1 at 2, the home of that person—as well as the home of any person who is related to or who associates with that person—can be raided and searched by government agents any time an arrest for firearm possession is made.

The first issue in this case is therefore simple: Does probable cause exist to execute a search warrant for a home based solely on arresting a person who lives there for a gun offense when officers present not a single other piece of evidence that the home is or has ever been linked to any criminal activity? The MPD has begun a policy of violently raiding and searching homes when it

3

finds a firearm during a traffic or a street stop, and it did so for the homes of at least 56 families all over the District during the year surrounding the raid of the Plaintiffs' home.  Doc. 1 at ¶ 40. In none of those cases did officers possess any evidence linking the home to any criminal activity. Instead, the enormously intrusive home raids and searches were predicated entirely on statements, like those of Defendant Pugh, about the habits of "gun possessors."  Doc. 1-1 at 2.

The result is a new system in which an entire class of criminals—those arrested for gun possession and those related to or friends with them—are subject to routine search of their homes, not because of any evidence about their home, but because of the category of criminal that they are alleged to be.  To understand how radical a departure these non-evidence "training" and "experience" based home raids are from long established Fourth Amendment principles, it is important to discuss the caselaw that the Defendants ignore.

1. **Probable Cause Requires Specific Facts Connecting the Place to Be Searched to Criminal Activity**

The Defendants first argue, Doc. 7 at 9,[1] that probable cause existed on the face of the warrant application. This argument can only be made by misapplying and ignoring the relevant caselaw.  The Defendants fail to cite any authority that could possibly support the notion that probable cause existed to search the family's home based solely on the gun arrest three days earlier.

To obtain a search warrant, police officers must demonstrate "probable cause" to believe that evidence of a crime will be found in the particular place that they want to search.  While flexible and based on common sense, the "probable cause" standard is rigorous.  As classically formulated, it requires that "the facts and circumstances … are sufficient in themselves to warrant

---

[1] Because the Defendants combine two documents with separate pagination (both titled "Motion to Dismiss") into a single electronically filed document, the pagination in the Defendants' memorandum of law differs from the pagination assigned by ECF.  For purposes of consistency, the Plaintiffs' citations to those documents will use the ECF pagination.

a [wo]man of reasonable caution in the belief that an offense has been or is being committed."

*Brinegar v. United States*, 338 U.S. 160, 175-76 (1949).   In the search warrant context, this

standard means that a warrant application must provide evidence sufficient to warrant a reasonable

person to believe that evidence of criminal activity will be found in the particular place to be

searched.   *See, e.g.*, *United States v. Nolan*, 199 F.3d 1180, 1183 (10th Cir. 1999) ("The test is

whether the facts presented in the affidavit would warrant a [wo]man of reasonable caution to

believe that evidence of a crime will be found at the place to be searched."); *United States v.*

*Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002) ("It is critical to a showing of probable cause that

the affidavit state facts sufficient to justify a conclusion that evidence or contraband will probably

be found at the premises to be searched.") (quotations omitted).

The Fourth Amendment therefore requires evidence specifically linking the place to be

searched to criminal activity, and it is not sufficient to declare merely that a "criminal," Doc. 7 at

4, lives there.   As the Supreme Court has made clear:

> The critical element in a reasonable search is not that the owner of the property is
> suspected of crime but that there is reasonable cause to believe that the specific
> "things" to be searched for and seized are located on the property to which entry is
> sought.

*Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978); *United States v. Grubbs*, 547 U.S. 90, 96

(2006).   The *Zurcher* rule is not some inconvenient preference; it is an emphatic and longstanding

requirement of the Fourth Amendment.

Numerous federal cases affirm the fundamental proposition that a warrant application must

provide specific information that evidence of a crime will be found at the particular place to be

searched.   *See, e.g., United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006) ("[T]he

affidavit must suggest that there is reasonable cause to believe that the specific things to be

searched for and seized are located on the property to which entry is sought and not merely that

the owner of property is suspected of crime.") (quoting *Zurcher*, 436 U.S. at 556 (internal quotations removed)); *United States v. Lalor*, 996 F.2d 1578, 1583 (4th Cir. 1993) (noting that "residential searches [are] upheld only where some information links the criminal activity to the defendant's residence"); *Martin*, 297 F.3d at 1314 ("[T]he affidavit should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity.").

Defendant Pugh's approach—which the Defendants defend without explanation—is to attempt a way around these common-sense principles by claiming that he "believes" that all "gun possessors" habitually keep long lists of broad categories of evidence of their crimes in their home. Doc. 1-1. That purported knowledge, the theory goes, substitutes for any specific evidence about any particular person and any particular location.  If accepted, this rationale would eviscerate the *Zurcher* "critical element" rule and the historic body of constitutional principle that it reflects. Any government officer could, at any time, assert that any kind of "criminal" has a habit of keeping evidence of his or her crime at home, and any arrestee's family home could automatically be subject to comprehensive search by government employees.

Federal courts have repeatedly rejected search warrants based on allegations of criminal activity that did not sufficiently establish that evidence of the crime would be present at the particular location to be searched.  In *United States v. Rowland*, 145 F.3d 1194, 1204 (10th Cir. 1998), the court found no probable cause because "there must be additional evidence linking the person's home to the suspected criminal activity."[2]  *See, e.g. Hendricks*, 743 F.2d 653 (finding

---

[2] In *Rowland*, the affidavit established that Rowland had ordered child pornography to his post-office box and that agents intended to make a controlled delivery to the post-office box.  It stated that agents had seen Rowland collect his mail at that box in the past and then walk back to work at a local government agency.  The affidavit concluded that he would likely take the material back to his office and then, later, to his home.  But the court explained that the "affidavit contained no information suggesting that Rowland had previously transported contraband from his private post office box to his home or that he had previously stored contraband at his home. *Nor did the affidavit provide any facts linking Rowland's residence to suspected illegal activity, such as in the past having similar video tapes or other*

warrant invalid because the affidavit provided no evidence that Hendricks would take the contraband to his home after collecting it). In *Lalor*, 996 F.2d at 1579–83, the affidavit contained information from two informants that Lalor was selling cocaine and corroborated key aspects of that information, including Lalor's arrest for drug distribution five days earlier. But nothing in the affidavit showed a particular connection to the residence or connected any of the drug sales to the residence. In rejecting the sufficiency of the affidavit, the court explained that: "In determining whether a search warrant is supported by probable cause, the crucial element is not whether the target of the search is suspected of a crime, but whether it is reasonable to believe that the items to be seized will be found in the place to be searched." *Id*. at 1582.

Equating probable cause for an arrest with probable cause to search a person's home thus risks allowing search of a residence in every case in which a person is arrested, thereby compromising a wholly different set of fundamental interests. As the Supreme Court explained:

> An arrest warrant is issued by a magistrate upon a showing that probable cause exists to believe that the subject of the warrant has committed an offense and thus the warrant primarily serves to protect an individual from an unreasonable seizure. A search warrant, in contrast, is issued upon a showing of probable cause to believe that the legitimate object of a search is located in a particular place, and therefore safeguards an individual's interest in the privacy of his home and possessions against the unjustified intrusion of the police.

*Steagald v. United States*, 451 U.S. 204, 213 (1981).

This basic principle cannot be overcome by Defendant Pugh's vague opinions about categories of criminals. *See, e.g., United States v. Schultz*, 14 F.3d 1093, 1097-98 (6th Cir. 1994)

---

*illegal materials delivered directly to his home.*" 145 F.3d at 1204 (emphasis added). The court noted, *id*. at 1205, that one could infer that Rowland would not watch or store the videos at his government office, but held:

> Rowland's home, however, was but one of an otherwise unlimited possible sites for viewing or storage. The Carr affidavit provided no basis to either limit the possible sites or suggest that Rowland's home was more likely than the otherwise endless possibilities. As a consequence, the possible inference that Rowland would take the tapes home, in and of itself, is insufficient to provide a substantial basis for concluding there was probable cause to believe the contraband would be in Rowland's home at the time the search was to take place.

(holding that although the training and experience of a police officer may be considered in weighing probable cause, "it cannot substitute for the lack of evidentiary nexus" because "[t]o find otherwise would be to invite general warrants authorizing searches of any property owned, rented, or otherwise used by a criminal suspect—just the type of broad warrant the Fourth Amendment was designed to foreclose."); *United States v. Rios*, 881 F. Supp. 772, 775 (D. Conn. 1995) (holding that an affidavit containing an officer's opinion but no facts to support an inference that evidence of the person's criminal activity would be found at the home did not provide a substantial basis for a finding of probable cause). The court in *United States v. Gomez*, 652 F. Supp. 461, 463 (E.D.N.Y. 1987), explained the fundamental concern:

> [When] there is nothing to connect the illegal activity with the arrested person's apartment, to issue a warrant based solely on the agent's expert opinion would be to license virtually automatic searches of residences of persons arrested for narcotics offenses.

*See also United States v. Rosario*, 918 F. Supp. 524, 531 (D.R.I. 1996) ("To permit a search warrant based solely upon the self-avowed expertise of a law-enforcement agent, without any other factual nexus to the subject property, would be an open invitation to vague warrants authorizing virtually automatic searches of any property used by a criminal suspect."); *United States v. Kenney*, 595 F. Supp. 1453, 1461 (D. Me. 1984) ("Although there need not be absolute proof that an alleged drug dealer keeps his drugs, records, etc. at his home, there must be some indication that the home is implicated to warrant the major intrusion of a search."); *United States v. Guzman*, 1998 WL 61850 at *4 (S.D.N.Y. Feb. 13, 1998) ("Permitting a search warrant based solely on the self-avowed expertise of a law-enforcement agent, without any other factual nexus to the subject property, would be an open invitation to vague warrants authorizing virtually automatic searches of any property used by a criminal suspect."). *Guzman* went on to warn of the policy now being implemented by the MPD:

> By way of expert opinion, law enforcement agents could effectively eviscerate the rule that probable cause to arrest an individual does not, in and of itself, provide probable cause to search that person's home or car.

*Id.* (quotations, citation, and alteration omitted).[3]

A few months ago, the Supreme Court held in *Riley v. California*, 134 S. Ct. 2473 (2014), that a person's cellular phone could not be automatically searched incident to an arrest. Instead, the Court held, a separate warrant must issue demonstrating that probable cause exists to search the contents of the phone. The Court analogized phones to its historical precedent concerning a person's home, explaining that the "search of the arrestee's entire house was a substantial invasion beyond the arrest itself." *Id.* at 2488. The Court once again quoted, as it had in *Chimel v. California*, 395 U.S. 752 (1969), Judge Learned Hand's formulation: "it is a totally different thing to search a man's pockets and use against him what they contain, from ransacking his house for everything which may incriminate him." *Riley*, 134 S.Ct. at 2490-91 (quoting *United States v. Kirschenblatt*, 16 F.2d 202, 203 (2d Cir. 1926). *Riley* therefore relied on *Chimel*'s classic analysis:

> It is argued in the present case that it is 'reasonable' to search a man's house when he is arrested in it. But that argument is founded on little more than a subjective view regarding the acceptability of certain sorts of police conduct, and not on considerations relevant to Fourth Amendment interests. Under such an unconfined analysis, Fourth Amendment protection in this area would approach the

---

[3] *See, e.g., State v. Mische*, 448 N.W.2d 415, 422 (N.D. 1989) ("We do not conclude that general allegations that contraband may be kept at the residence of the person involved cannot be considered in establishing probable cause to issue a warrant. However, in view of the special protection given to the home…something additional and more objective than the facile conclusion that contraband is ordinarily kept in the home should be required to establish probable cause to search that home."); *State v. Thein*, 977 P.2d 582, 588 (Wash. 1999) ("Most courts, however, require that a nexus between the items to be seized and the place to be searched must be established by specific facts; an officer's general conclusions are not enough."); *State v. Rabb*, 920 So.2d 1175, 1187–88 (Fla.App.2006) (holding that the police lacked probable cause to search a home for marijuana when they found three marijuana cigarettes on a person and marijuana cultivation books in his car); *People v. Pressey*, 126 Cal.Rptr.2d 162, 169 (2002) (concluding that probable cause to search a suspected drug user's residence requires more than the inference that drug users often keep drugs at home); *Ex parte Perry*, 814 So.2d 840, 843 (Ala. 2001) (holding that "a defendant's possession of illegal drugs does not, without more, make reasonable a search of the defendant's residence"); *State v. Johnson*, 589 N.W.2d 108, 116 (Neb. 1999) (holding that the warrant to search a house lacked probable cause when police found a vial of methamphetamine on the defendant); *State v. Rangitsch*, 700 P.2d 382, 388 (Wash. App. 1985) (stating that the officer's statement in the affidavit that "habitual users of drugs keep drugs and paraphernalia in their home" was "mere speculation").

> evaporation point. It is not easy to explain why, for instance, it is less subjectively 'reasonable' to search a man's house when he is arrested on his front lawn—or just down the street—than it is when he happens to be in the house at the time of arrest.

395 U.S. at 764-65.  *Chimel* thus makes clear the independent importance of obtaining a separate search warrant that is itself supported by probable cause to believe that evidence of a crime will be found in the home.

But *Riley* and *Chimel*, and all of the principles on which they are founded, would evaporate if police ignored *Steagald* and *Zurcher*: if obtaining a warrant were automatic after a gun arrest without any single other piece of particular evidence to suggest that a search of a home would yield additional evidence.  The entire point of *Riley* is that, after an arrest, a separate specific (and truthful, *see infra*) showing of probable cause must be made to a neutral magistrate that the *additional place sought to be searched* will contain evidence of the crime.

## 2. There Is No Fourth Amendment Exception for the Category of People Who Are Gun Possessors

This Court has previously warned the MPD that searches like the one here fall "far short" of probable cause with its holding in *United States v. Hopkins*, 128 F. Supp. 2d 1, 7 (D.D.C. 2000).  In *Hopkins*, this Court confronted a search warrant for guns and related accessories at a home based on the arrest of a subject outside of the home.  In holding that the warrant lacked probable cause, the court explained:

> Cutting away then all of this superfluous information, one is left with little more than "bare bones." The only references to firearms are the following: (1) Mr. Hopkins had been arrested on a firearms violation in the general proximity of his residence (1–3 blocks) less than seventy-two hours earlier, (2) Mr. Hopkins had been arrested on a firearms violation on August 28, 1998 [the previous year], (3) Mr. Ashley has participated in over 150 arrests and warrants for narcotics violations, but some unknown number of arrests for firearms and weapons violations. These three references fall far short of providing probable cause that Hopkins had firearms and related accessories in his residence.

10

*Id*. at 7 (citation omitted).  *Hopkins* served as a warning to MPD officers that seeking to search a home based on a firearms arrest near the home without providing any other evidence that the home was involved in any illegal activity was not sufficient.  As Judge Lamberth explained, "the inference made in this case amounted to the following: suspects who are arrested for gun violations twice in fifteen months have illegal guns and related accessories in their home. This is simply not enough to support a finding of probable cause."  *Id*.

If the warrant application in *Hopkins* fell "far short" of providing probable cause, the warrant application in this case was worse.  Indeed, in *Hopkins*, the suspect had an arrest the previous year for another firearms violation (suggesting a pattern of personal gun possession).  Here, the warrant application provided no information at all about Mr. Pitts' individual history (let alone any history of gun possession or other criminal behavior), and merely claimed that the "area" (which is home to almost 30,000 people, *see infra* at 28 & n.10) was high in robberies and that an unknown source(s) of unknown reliability had claimed that an unknown person of unknown description had been known to stand at unknown times on the same public block in front of a large housing apartment complex possessing a gun.

The Defendants nonetheless claim that this is "exactly the kind of evidence upon which prudent people rely in reaching reasonable beliefs."  Doc. 7 at 11.  The Defendants' rationale for that claim is telling.  They simply state: "A known resident of the apartment illegally possessed a firearm."  Doc. 7 at 11.  This frightening reasoning would mean that any family home of any gun arrestee anywhere in the city—or anywhere in the country—could be searched so long as a police officer stated that he "believed" that gun possessors would keep any of a laundry list of speculative items at the home (including photographs that such people "like" to take of themselves, papers, documents, "laser gun sights," "ballistic body armor," and numerous other items, *see* Doc. 1-1).

But if this reasoning were viable, why would it not cover the family home of any "criminal," as the defendants refer to Tyrone Pitts?  Doc. 7 at 4.  Indeed, in other warrant applications from the same period, MPD officers have done exactly that, opining to Superior Court judges about the habits of all "persons involved in illegal activity," *see, e.g.*, 2012-CRW-3299 (D.C. Super. 2012), and claiming, just as Defendant Pugh did here, that all such "persons" keep the same kinds of gun items and accessories that Defendant Pugh sought here.  *Id.*

It is telling that this radical claim in the Defendants' brief—that the home of any gun arrestee can be comprehensively searched and all papers and photographs examined by government agents—contains not a single citation of relevant law.  Probable cause is a lower bar than conviction would require, but it is still a rigorous standard that requires enough particularized evidence to convince a reasonably cautious person to believe that particular evidence will be found in a particular location.  *Brinegar*, 338 U.S. at 175-76.   It does not appear significant to the Defendants to engineer self-serving statements of "training" and "experience" in order to subject "criminals" like gun possessors and their entire families to such enormous intrusions.  And it may be only a subtle shift to further extend that idea from "gun possessors" to all "persons involved in illegal activities," as the MPD has now attempted.  But the creeping normalization of these insidious practices is something to which the courts must be always vigilant. *Coolidge v. New Hampshire*, 403 U.S. 443, 454 (1971) ("It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure.").

The Defendants do not argue that *any* court has *ever* come close to holding that a single gun arrest can allow the comprehensive search of a family's home.  That omission is not surprising, given that the only case from this Court to deal with those facts came to the opposite conclusion.

12

### 3. The Warrant Application So Lacked Probable Cause that Reliance on the Application Was Not Objectively Reasonable

As discussed in Sections I.B and I.C, *Leon* and *Malley* do not save Defendant Pugh's deficient warrant application because this case involves the kind of false, misleading, and fraudulent statements designed to mislead the issuing magistrate that Judge Lamberth explicitly noted were absent in *Hopkins*, *see infra* at 16-23, and because the application was based on the fruits of unconstitutional police behavior, *see infra* at 23-29.   However, even had the information in Defendant Pugh's application been truthful and lawfully obtained, it would still have been so lacking in evidence to establish probable cause that reliance on it was not reasonable.

Judge Lamberth went on to hold in *Hopkins* that the *Leon* "good faith" exception applied because officers "assumed that one who has a past of carrying guns, and has just recently carried a gun near his home is likely to have gun paraphernalia in his home," *id*. at 9, and because this assumption was "not absurd" such that their behavior was unreasonable.  *Id.* at 10.  Thus, the *Leon*/*Malley* shield does not apply in this case for at least two additional reasons: (1) The evidence in this case was far weaker than the already weak evidence in *Hopkins* because there was no established "past of carrying guns" as demonstrated by the suspect's prior gun arrest; and (2) The existence of *Hopkins* put reasonable officers in this jurisdiction on notice that those circumstances fell "far short" of probable cause to invade a family's home.  To the extent MPD officers were not already on notice before *Hopkins*, after *Hopkins*, MPD officers were explicitly on notice that such gun arrests did not come close to establishing probable cause to raid a home.  Ironically, the Defendants now attempt to use *Hopkins*—a case that condemns what they did—as a defense to liability, claiming that because *Leon* saved the conduct of officers twelve years before in *Hopkins*, it should always and forever save officers who do not heed *Hopkins's* warning and *who commit the same misconduct* again in the future.  By that logic, this Court could reaffirm that the conduct

13

of the officers was blatantly unlawful, but shield them from liability; then, the next time MPD

officers committed the same illegality, they could make the same argument in perpetuity to shield

themselves from liability. Thankfully, the whole point of making a finding that probable cause

fell "far short" but applying the "good faith" exception is to serve as precedent for future officers

about what is objectively reasonable while shielding the first set of police officers who could argue

that they did not have fair warning. Here, instead of heeding that warning, the MPD has, in recent

years, reinvigorated the same program and pursued a concerted city-wide effort, as alleged in the

Complaint, to automatically search the homes of people found with a firearm anywhere in the

District. This is not only an enormous and dangerous extension of their authority, but it signals a

complete disregard for the principles that this Court announced to the MPD in *Hopkins*.[4]

The Defendants bizarrely argue, in a footnote, that the "Supreme Court has routinely

rejected categorical approaches to finding probable cause." Doc. 7 at 12n.5. But it is the

Defendants' view—that any person, or any person who is related to or who is friends with or who

associates with an arrestee can categorically have their home searched because of the type of

"criminal" they are dealing with, and not because of any evidence about the home—that represents

a "categorical" approach to probable cause. The Plaintiffs' argument, consistent with the entire

---

[4] The Defendants suggest that Defendant Pugh's statements about his "beliefs" are a way around *Hopkins*. Doc. 7 at 12. The Defendants misinterpret Judge Lamberth's decision in *Hopkins*. The point of *Hopkins*, and of all of the cases cited by the Plaintiffs, is not simply that the officer could have overcome the total lack of evidentiary nexus to the home by claiming that he "believes" that all gun possessors keep long lists of evidence in their home.

The Defendants make passing reference to *United States v. Thomas*, 989 F.2d 1252 (D.C. Cir. 1993), which contains categorical factual statements about successful drug dealers likely keeping evidence of drug distribution in their homes. As Judge Lamberth explained in *Hopkins*, this drug-culture precedent is simply not applicable to cases in which a single gun is found on a person in a single incident. 128 F. Supp. 2d at 7-8. More fundamentally, *Thomas* came to that conclusion because the affidavit in that case opined that drug dealers would keep those items "in their houses." 989 F.2d at 1254. *Thomas* therefore relied on a deeply flawed factual assumption that the MPD itself has now rejected: that successful drug distributors keep those items in their *homes*. The MPD now trains its officers that drug distributors, like gun possessors, try to hide those items in a variety of places that are *not* their homes, including the homes of relatives, the homes of friends, the homes of associates, stash houses, and businesses. Doc. 1 at ¶ 34. The MPD even attempts to search the homes of associates of gun possessors on that basis. *See* 2012-crw-3299.

history of American legal understanding of the Fourth Amendment, is that the particularized evidence in a case must establish the likelihood of finding specific evidence in a particular location.

Defendant Pugh attempted to get around the lack of any evidence about the home and legal precedent requiring particularized probable cause by categorically asserting that he "believes" that "gun possessors" keep numerous papers, photographs, and items related to gun crimes, Doc. 1-1, and that this evidence is "commonly" kept at their home. It is difficult to imagine what is meant in the federal caselaw by "bare bones" assertions if not language like this. *See Illinois v. Gates*, 462 U.S. 213, 239 (1983) (condemning "bare bones" applications that seek "a mere ratification of the bare conclusions" of an officer on the questions critical to probable cause). On the sole basis of these assertions about his "beliefs" about a generic category of human beings—"gun possessors"—Defendant Pugh requested to search the "entire" premises for a wide-ranging list of items which he did not even know Mr. Pitts possessed, let alone that he possessed in that location.

The application in this case thus woefully lacked probable cause and, even were it not full of falsities and illegally obtained information, no reasonable officer could have concluded that it provided sufficient evidence for a reasonably cautious person to conclude that the specific items sought would be inside the home. Allowing agents of the government to rummage through all of the belongings and documents of Patrice and Michael Pitts because of a firearm found outside the home in the possession of Tyrone Pitts three days before, without a single fact establishing that the house had ever been involved in criminal activity, would work a fundamental and unreasonable alteration to the meaning of the Fourth Amendment and to the balance of power in our community.

**B.  The Application Relies on False and Misleading Statements and Omissions**

The warrant application in this case contains two main categories of false statements and omissions. First, and most generally, the application relies on statements about the purported

general habits of "gun possessors" that are knowingly and recklessly false and misleading. Second, the warrant application contains false statements about what actually happened on the scene that were designed to mislead the issuing judge into believing that the evidence being evaluated was obtained lawfully as required by binding precedent.

### 1. The False and Misleading Statements of "Training" and "Experience."

As the Defendants concede, under *Franks* and its progeny, when evaluating a warrant that contains false statements and material omissions, the Court must evaluate the warrant *de novo* and without deference after removing the falsities and inserting the omissions.  Doc. 7 at 9; *United States v. Cardoza,* 713 F.3d 656, 658 (D.C. Cir. 2013); *United States v. Wells*, 223 F.3d 835, 838-840 (8th Cir. 2000); *United States v. Sarras*, 575 F.3d 1191, 1218 (11th Cir. 2009).  Because this Court's probable cause review is *de novo*, the effect of the falsities and omissions is to be considered cumulatively. *United States v. Stanert*, 762 F.2d 775, 782 (9th Cir. 1985).

Although the content and order of the Defendants' arguments are difficult to decipher, the Defendants appear to make only two brief arguments on this issue and to ignore most of the Plaintiffs' allegations.  First, the Defendants claim that the failure to inform the issuing judge of the woeful failure rates of MPD warrants based on "training" and "experience" in gun possession cases was acceptable because the Plaintiffs' attempts to "quantify" probable cause are somehow impermissible.  The failure rates revealed in MPD records, the Defendants argue, are irrelevant because the use of empirical evidence has no place in the world of probable cause.  Doc. 7 at 13.[5] This argument both fails to understand the Plaintiffs' allegations and is nonsensical.

---

[5] The Defendants cite for this proposition *Florida v. Harris*, 133 S. Ct. 1050 (2013), which they take completely out of context.  The Supreme Court's discussion of the lack of reliability of the field performance of detector dogs is irrelevant on its face.  Nothing in *Harris* suggests that examining what MPD officers actually find in home searches and comparing that to what they said in advance that they would find would not be relevant in testing those factual assertions.  Indeed, the very goal of a warrant application is for an officer to convince a reasonably cautious person that those things will probably be found.  *Harris* simply rejected a "strict evidentiary checklist" for probable cause, but it still encouraged, *id.* at 1058, adversarial empirical testing of police assertions.  When an officer makes a factual

The Plaintiffs alleged in their Complaint that MPD officers basing searches of homes on statements of "training" and "experience" after recovering a gun in the possession of a suspect fail to find a firearm in 91% of such home searches.  Doc. 1 at ¶30.  Moreover, according to their own records, MPD officers fail to find the kinds of documents and papers listed by Defendant Pugh in over 94% of such searches (and likely higher).[6]  *Id.* The Plaintiffs need not, as the Defendants suggest, argue that these failure rates of 91% and 94%, as a matter of law, by themselves establish a lack of probable cause.  Instead, the Plaintiffs' point is less categorical and dramatic.  Because it is the role of the neutral magistrate to evaluate probable cause based on the "totality of the circumstances," it is vital that the neutral magistrate is given reasonably accurate and complete information.  By telling the judge that he would find certain items based on the MPD's "training" and his "experience" that such items are "commonly" found in those homes while hiding from the judge that MPD officers do *not* find those items in an overwhelming majority of such searches in the District, Defendants Pugh deprived the judge of information that any reasonable person would want to know when making a decision based on the "totality of the circumstances."

Presented with this information, a judge would be able to evaluate whether it was actually probable that those items would be found in the Plaintiffs' home and, presented with the actual experience of MPD officers from their own records, would question some of the myriad unstated claims and assumptions about the kinds of "persons who keep or carry guns" described by

claim based on something quantifiable and about which the officer and the MPD keep records, examining those records to see whether the factual claim is invalid or wildly exaggerated is obviously "relevant."

[6] This broad list is also significant because it purported to allow the officers raiding the home the ability to examine every piece of paper in the family's home in search of vague and unexplained lists of hypothetical evidence of criminal activity.  It also purportedly gave them authority to search through any computers found in the home, Doc. 1 at ¶ 20-21, even though the *Defendants had no idea whether the Plaintiffs even had a computer*.  *Id*. at ¶ 22.  That kind of penetrating search through every document can be justified only by particularized evidence that examination of those materials is justified by particularized probable cause.  *See Harris v. United States*, 331 U.S. 145, 152 (1947) ("The same meticulous investigation which would be appropriate in a search for two small canceled checks could not be considered reasonable where agents are seeking a stolen automobile or an illegal still.").

Defendant Pugh.  Doc. 1-1 at 2.  A reasonable judge would realize that the central factual claim

on which the judge was being asked to authorize a home search—the "training" and "experience"

of the officer about D.C. gun possessors—is not the actual experience of D.C. police.  Contrary to

the Defendants' suggestion, a judge need not conclude as a matter of law that a failure rate of over

50% or 75% or 94% automatically bars issuance of a warrant, but overwhelming failure rates may

give the judge pause before issuing a warrant based on unstated assumptions and without any other

particularized evidence about the property beyond the officer's generalized factual assertions.

This case therefore involves not just material information that should have been presented

in its own right, but also the fact that the omitted information would have suggested to the judge

the falsity of Defendant Pugh's statements about the content of his "training" and "experience."

Defendant Pugh portrayed his factual assertions about the habits of "gun possessors" to be the

learned truth of solemn experts.  He noted that he learned this knowledge from his "training,"

including at the MPD "Institute of Police Science" and from his "experience," which included the

experiences of "other veteran police officers, investigators, and detectives."  Doc. 1-1 at 1.  As the

Defendants argue in the Motion, *it was the purported truth of those assertions* that gave rise to

probable cause in the first place.  Doc. 7 at 12.  But the Plaintiffs allege that the content of that

"training" and "experience" was deliberately and recklessly misrepresented to the issuing judge as

part of a vague web of broad assertions designed not to reveal the truth but to justify an intrusive

search that lacked any specific evidence.

By hiding this information, Defendant Pugh was able to base a search entirely on a factual

claim and then hide evidence from the neutral arbiter that would have called into question that key

factual claim.  Because factual information recorded and kept by MPD officers disproves the

central evidentiary assertions of "training" and "experience" upon which the entire warrant

application rested, that information should have been included in the warrant application. This is information for the judge to consider, not for police to withhold.

Second, in a different section of the Motion, the Defendants argue that the false statements and omissions are "not relevant" because they do "not reflect on Officer Pugh's (the affiant's) training and experience and because it does not negate the possibility of success, and cannot, therefore, eliminate his reasonable belief." Doc. 7 at 14. Neither of these claims are supported by any explanation, citation, argument, or analysis.

It is difficult to understand what these arguments mean without any support. The first clause appears to suggest that the Defendants are either disputing the factual allegation in the Complaint about the content of Defendant Pugh's training and experience (i.e. claiming that his "training" and "experience" is different from that of other MPD officers) or asserting that the MPD, despite knowing that these "training" and "experience" based home raids are woefully ineffective, actively misled Defendant Pugh and "trained" him at the "Institute of Police Science" that such raids are actually effective. In any case, the Plaintiffs allege that Defendant Pugh got the same training as the numerous other MPD officers who were trained to include such statements of "training" and "experience" in warrant applications when they have no information about a particular location despite knowing that the items they were seeking would not likely be found. Doc. 1 at ¶ 37-41. The Defendants offer no reason to believe that the experience of Defendant Pugh and the numerous "other police officers, investigators, and detectives" on which he based his application, would somehow be different from the experience of the MPD as a whole or the training that all officers receive from the same training programs.

More simply, though, the Defendants ignore what the MPD and dozens of its officers have sworn under oath repeatedly to Superior Court judges in other warrant applications. Defendant

Pugh, the MPD, and the many dozens of officers who have sought and obtained such "training" and "experience" based warrants know that the very same items that Defendant Pugh claimed that he knew that he would find in the home are actually kept, if they even exist at all (which they typically do not because low-income illegal gun possessors rarely even possess the accoutrements of gun ownership, Doc. 1 at ¶ 32), in a variety of places that are *not* the person's home.

MPD officers have routinely for several years sworn under oath to numerous Superior Court judges that their "training" and "experience" has taught them that gun-related items and documents are likely to be found *either* in a person's home *or* in the home of friends, *or* in the home of relatives, *or* in the home of associates, *or* in a business controlled by the suspect, *or* in a variety of other places, such as stash houses, or mobile vehicles to which the person has access. Doc. 1 at ¶ 34. The publicly available examples of such assertions of "training" and "experience" are ubiquitous across MPD police districts. *See, e.g.*, 2012-crw-3107; 2013-crw-510; 2013-crw-964; 2013-crw-2115; 2014-crw-494. Defendant Pugh deliberately withheld this information from the judge in this case. By withholding this material information from the judge—information that would have removed any probable cause basis to believe that gun-related items would have been stored at 3921 4th Street home in particular, Defendant Pugh misled the issuing judge.[7]

It says a great deal that the Defendants do not address this dispositive issue. Reporting to a judge that, based on one's "training" and "experience," items will be found in the gun possessor's home while knowing that this "training" and "experience" teaches that "illegal gun possessors" in D.C. either do not have such items or commonly keep those same items in a variety of other places

---

[7] The same applies for the other factual allegations in the Complaint that the Defendants ignore, including Defendant Pugh's deliberate deception concerning the actual habits of low-income gun possessors in the District (for example, his omission of the fact that firearms are routinely "passed and traded by individuals without documentation or records," Doc. 1 at ¶ 32) and his deception with respect to whether he was trained that individual bullets are sold in the District. Doc. 1 at ¶ 32-34 & n.4.

that are not the "gun possessor's" home, misleads the judge on the most critical issue related to probable cause. We are now even told by the Defendants that this statement of expertise—that a category of people keeps this laundry list of items at their own home—*is the reason that the warrant was valid*. If that integral assertion is untrue and incomplete, which the Complaint alleges, any justification for the warrant, even in the scary world envisioned by the Defendants, disappears.

The Defendants' entire submission relating to this dispositive issue is a two-sentence footnote with no legal citations. Doc. 7 at 14n.7. The Defendants argue: "That evidence is likely to be found elsewhere, outside the home, is irrelevant to whether evidence is also likely to be found inside the home." *Id*. According to the Defendants, the existence of many other places in which "training" and "experience" demonstrate that the items might be found is "irrelevant" to whether it would be found in the Plaintiffs' home. That is absurd. The reason that Defendant Pugh made the assertion in the first place was to narrow the myriad possible locations in the world at which the items might be found. An admission that Defendant Pugh did not know whether the items would be found at any one of those places in particular would have been critical to any judicial analysis of probable cause. If this category of "criminal" stores these items in any one of those places, that fact destroys any particularized probable cause to believe that they would be in the Plaintiffs' home. The Defendants do not explain how the existence of many places where the same items might otherwise be located could have "no bearing" on the belief that they would be at any one of those places in particular.

Exactly the opposite is true: the admission that the same items might be in any one of a number of other places eviscerates any probable cause to search 3921 4th Street #2 in particular. To the extent the evidence is "likely" to be found at locations B, C, D, E, or F, it becomes less probable that the evidence is at location A. *See, e.g., Rowland*, 145 F.3d 1194 at 1205. Had

Defendant Pugh sought, for example, to conduct a search in an apartment building but claimed that the evidence he sought was in either Apartment 102 or Apartment 205 or in Apartment 706 or in Apartment 508, he would clearly not have probable cause to search Apartment 102. *See, e.g.*, *In re K.H.*, 14 A.3d 1087, 1092 (D.C. 2011) (fleeing robber going into any one of four apartments did not give police probable cause to raid Apartment 3 even with indication that voices were heard in Apartment 3 discussing the police).

Finally, the Defendants fail to engage with the Orwellian significance of their assertion that these items are also "likely" to be found elsewhere, thus justifying a search of *all those places*. On the Defendants' reasoning, a stop and arrest of a person with a gun would enable police searches of the home of every person who is related to that person, every person who is friends with that person, every person who associates with that person, and every person who shares a business with that person, among other places. All of this because an MPD officer opined that his "training" and "experience" led him to believe that the list of evidence sought was "commonly" held in one of those places "or" the other. A corrected warrant application including that truthful information would thus negate any possible notion of particularized probable cause as that term has been understood since the 1790s.

The Defendants' final claim—that the high failure rate "does not negate the possibility of success," Doc. 7 at 14—is baffling. The Fourth Amendment is not concerned with the mere "possibility" of turning up evidence of a crime; "the Founders did not fight a revolution," *Riley*, 134 S.Ct at 2491, 2494, to allow armed home searches seeking the mere "possibility" of criminal activity. The question in this case is whether the application, fairly considered including all of the corrected false statements and omissions, gives rise to *probable cause*. Because this question rests on whether specific facts warrant a reasonably cautious person in the belief that the listed items

will be found at the location, knowledge that those items are rarely found in such searches (because people either do not keep them or keep them elsewhere) undermines the reasonable belief that they will be found, even if it is "possible" that they might be found.

### C. The Warrant Improperly Relied on Information Obtained in Unconstitutional and Illegal Searches and Seizures

### 1. The Defendants Misunderstand the Law Applicable to the Plaintiffs' Claims

It is well established that police officers cannot use the warrant process to purge the taint from otherwise illegally obtained evidence. *See Segura v. United States*, 468 U.S. 796, 814 (1984) ("None of the information on which the warrant was secured was derived from or related in any way to the initial [unlawful] entry into petitioners' apartment."); *Alderman v. United States*, 394 U.S. 165, 177 (1969) ("Nothing seen or found on the premises may legally form the basis for an arrest or search warrant…."). As the Supreme Court explained in *Murray v. United States*, 487 U.S. 533, 540 (1988):

> An officer with probable cause sufficient to obtain a search warrant would be foolish to enter the premises first in an unlawful manner. By doing so, he would risk suppression of all evidence on the premises, both seen and unseen, since his action would add to the normal burden of convincing a magistrate that there is probable cause the much more onerous burden of convincing a trial court that *no information gained from the illegal entry affected either the law enforcement officers' decision to seek a warrant or the magistrate's decision to grant it*. Nor would the officer without sufficient probable cause to obtain a search warrant have any added incentive to conduct an unlawful entry, since whatever he finds cannot be used to establish probable cause before a magistrate.

(citation omitted, emphasis added). The Court in *Murray* later added that the warrant would not have been valid "if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant." *Id*. at 542. The D.C. Circuit has made the same fundamental point:

> When an affidavit in support of a search warrant contains information which is in part unlawfully obtained, the validity of a warrant and search depends on whether the untainted information, considered by itself, establishes probable cause for the warrant to issue.

*James v. United States*, 418 F.2d 1150, 1151 (D.C. Cir. 1969); *see also, e.g., United States v. Reilly*, 76 F.3d 1271, 1280 (2nd Cir. 1996) (declining to apply the good faith exception when the "issuance of the warrant was itself premised on material obtained in a prior search that today's holding makes clear was illegal"); *United States v. Davis*, 430 F.3d 345, 358 n.4 (6th Cir. 2005) ("[W]e agree with the numerous other circuits that have held that the *Leon* good-faith exception is inapplicable where a warrant was secured in part on the basis of an illegal search or seizure.").[8]

Therefore, the Defendants' conclusion that "the source of the evidence has no bearing on its usefulness in determining probable cause," Doc. 7 at 11, could not be more wrong. The Supreme Court and the D.C. Circuit have both held the opposite.

*Malley* holds that the *Leon* rule is the rule applied to civil cases: an officer will be liable for executing a warrant if the officer's reliance on the warrant is not objectively reasonable. 475 U.S. at 345-46. As the cases make clear, it is not objectively reasonable for an officer to rely on a warrant that depends on illegally seized evidence. Here, the Plaintiffs allege that Defendant Pugh deliberately lied to and hid information from the issuing judge to cover up that he had performed an illegal seizure and search to obtain a warrant that no judge, following binding precedent, could have issued. Reliance on that warrant was not reasonable.

---

[8] In *Reilly*, Judge Calabresi also explained: "It bears emphasis … that the good faith exception requires a sincerely held and objectively reasonable belief that the warrant is based on a valid application of the law to all the known facts. Good faith is not a blanket excuse for any police behavior. A warrant is not a general hunting license, nor is it a mantle of omnipotence, which cloaks its holders in the King's power to "do no wrong." And perhaps most important, it is not an excuse if the police are not frank with the magistrate in proceedings to obtain the warrant—proceedings that are typically *ex parte.*" 76 F.3d at 1273.

In arguing otherwise, the Defendants misunderstand the Plaintiffs' claim with respect to the illegally obtained evidence.  While it is true that the use at trial of illegally obtained evidence would "work no new Fourth Amendment wrong," *United States v. Calandra*, 414 U.S. 338, 354 (1974), the Plaintiffs are not vicariously asserting a claim on behalf of Tyrone Pitts for some separate wrong to him.  The claim of the Plaintiffs is that the Constitution prohibits police from obtaining a search warrant using illegally obtained evidence and that *they themselves had their Fourth Amendment rights violated* by the issuance of an invalid search warrant that never should have issued  The remedy when that happens is to evaluate the search warrant with the illegally obtained fruits removed from the application.

The federal courts have created that rule because the contrary situation would be absurd: Police could enter a family's property discretely without a warrant, use anything they saw in the home to go and apply for a warrant, and then raid the home pursuant to the warrant, seizing any evidence of a crime.  Police could even lie about the facts that rendered an initial search unlawful to prevent a judicial officer from ever having the chance to consider those facts, thereby fraudulently obtaining a warrant that never would have issued.  On the Defendants' theory, the family would have no civil claim for the warrant execution*, even for the harm that they themselves suffered in the raid and search of their home*, due to a warrant that would never have issued but for the lies of police officers covering up their illegal conduct.  Police could thus purge any unlawful actions by including them in a subsequent warrant application.  Thankfully, courts do not allow police to do that, instead requiring that warrant applications be based on truthful information that was learned by the police in a lawful manner.  *See, e.g., Reilly*, 76 F.3d at 1280 (2d Cir. 1996) ("For the good faith exception to apply, the police must reasonably believe that the warrant was based on a valid application of the law to the known facts. In the instant matter, the officers failed

to give these facts to the magistrate. The officers presented … a description that was almost calculated to mislead. Moreover, the officers failed to give Judge Barrett information as to their behavior, on the basis of which he could determine whether even this scant description was itself the fruit of an illegal search that lacked the elements of good faith."). Warrants predicated on unlawfully obtained information are invalid, and police officers know that.

The cases cited by the Defendants have nothing to do with that principle. *See, e.g., Rakas v. Illinois*, 439 U.S. 128, 134 (1978).[9] Instead, they concern standing to assert Fourth Amendment violations in criminal cases. In those cases, for example, criminal defendants attempted to claim that their Fourth Amendment rights were violated by an unlawful search of someone else. The Court held that those defendants did not have standing to assert the privacy rights of another person. The search warrant context is different. Here, the Plaintiffs clearly have standing because *their* home was raided, and their contention is that the warrant never should have issued. The Plaintiffs undoubtedly have a legitimate expectation of privacy in their residence.

Even the Defendants concede that a police officer would be liable if the officer were to search a home without a warrant. But they utterly fail to explain why the result should be different when an officer with no right to obtain a valid warrant tricks a magistrate into issuing a warrant by fraudulently describing the events and withholding the information necessary to determine that the warrant application was based on illegal conduct.

Using the warrant process to cleanse unlawful searches would be an abuse of the courts. When people subject to a search and violent home raid on the basis of an improperly issued and

---

[9] Indeed, in *Brown v. United States*, 411 U.S. 223 (1973), the actual owner of the location had successfully challenged the defective search warrant, but the people who did not own the premises could not assert the owner's rights because a person cannot assert Fourth Amendment claim unless his or her own legitimate expectation of privacy was violated by the government action.

fraudulently obtained warrant bring suit, they clearly have standing to assert that the warrant should not have issued but for the misconduct of the Defendants.

### 2.  The Illegal Search and Seizure of Tyrone Pitts

The Defendants' entire submission on the merits of the unlawful search and seizure of Tyrone Pitts is confined to a footnote.  *See* Doc. 7 at 10n.4.  The Defendants argue that "given Tyrone Pitts' behavior, his location, and information known to the officers about the area, the officers had reasonable suspicion to perform a patdown search."  *Id.*

This argument fails for three reasons.  First, the "behavior" alluded to by the Defendants was the behavior described by the warrant application, which the Plaintiffs allege was false.  The Plaintiffs do not allege that Tyrone Pitts, when alerted to the presence of officers, "avoided eye contact" and "appeared to be unsure of where he wanted to go."  Doc. 1-1.  Those are the false statements of Defendant Pugh.  The Plaintiffs instead allege that Tyron Pitts was grabbed and searched immediately without any of the interaction described by the Defendants and without giving consent.  Doc. 1 at ¶ 43-44. The Defendants cannot dispute these allegations or create their own factual allegations at this stage.  That should end the matter.

More disturbing, however, is the Defendants' unsupported assertion that Mr. Pitts's "behavior," even as it was falsely described in the warrant application, gave rise to reasonable suspicion to stop-and-frisk him.  Because the Defendants do not cite any cases beyond *Terry v. Ohio*, 392 U.S. 1 (1968), or provide any explanation for how they conclude that objective articulable suspicion of criminal activity existed here, it is difficult to reply to their argument. Nonetheless, their conclusion appears to be that a person who avoids eye-contact with the police, who is standing in a high crime "area," and who appears unsure of where he wants to go is somehow giving rise to an objective basis to believe that he is committing some unknown and

unspecified crime.  The Defendants do not point this Court to a single case anywhere in the country that has found reasonable suspicion under such circumstances.  That, too, should end the matter.

Underlying the Defendants' arguments are troubling hints of stereotyping.  It is not a crime to be nervous when seeing the police or to be on a street "unsure" of where one wants to go.  There was no allegation even from the Defendants that Mr. Pitts attempted to flee when seeing police and no allegation that any crime had occurred in the area at the time.  Moreover, the "high crime" area that served as the basis for the Defendants' arguments and that Defendant Pugh claimed to be patrolling were Police Service Areas (PSA) 704, 705, and 708.  PSA 704 is home to nearly 10,000 people and is 99.4% non-white; PSA 705 is home to nearly 6,500 people and is 98.9% non-white; PSA 708 is home to 10,900 people and is 97% non-white.[10]  Generic statements about robberies in an area home to nearly 30,000 people, claims from unknown sources about gun possession by unknown people at known dates and times and with no personal description at all, *see Alabama v. White*, 496 U.S. 325, 329 (1990), and a black man's nervousness when approached by multiple police officers simply does not give rise to an objective basis to believe that a crime was afoot.

It is revealing that not even Defendant Pugh claimed in the warrant application to have reasonable suspicion to conduct a *Terry* stop.  Instead, he described the stop as a consensual interaction and justified his stop-and-frisk on the basis of an entirely fabricated story of consent. Perhaps a jury will believe Defendant Pugh that a man with an illegal gun affirmatively asked officers to search him, but that is a question for the Plaintiffs' peers from the community and not a Motion to Dismiss.  For now, it is sufficient to note that even Defendant Pugh recognized that he could not stop and frisk a person on the street without any crime, without any description of any suspect, and in a heavily populated area.  That is why, according to the Plaintiffs' allegations,

---

[10] *See* http://www.neighborhoodinfodc.org/psa12/psa.html.

Defendant Pugh falsely stated in the application that he had received consent when he had not.  In any case, Defendant Pugh and the other officers immediately grabbed Mr. Pitts and searched through his pockets, a full search not warranted by the *Terry* stop that the Defendants now describe.

Because the seizure and search of Tyrone Pitts was unlawful, the information obtained as a result could not form the basis of a search warrant, and Defendant Pugh's warrant was invalid.

## II.      The Unreasonable Conduct of the Defendants During the Search

The Complaint alleges a number of unconstitutional and illegal police actions, beginning from the moment that the Defendants arrived at the home.

### A.  The Failure to Knock and Announce

The Defendants briefly argue that breaking the door and bursting into the Plaintiffs' home without knocking was reasonable.  They argue, Doc. 7 at 16-17, that raiding homes without knocking is allowed when police are investigating gun possession (even, apparently, when the gun possessor and his gun are already in custody) if officers are in a neighborhood that they assert[11] is high in crime.  They also mention unspecified rumors from an unknown source that an unknown person with an unknown description had previously, at unknown dates and times, possessed a gun on the street outside the housing complex (although, by the time of the warrant execution, officers believed that man to be the man that they had already arrested).[12]  Although the Defendants call these considerations "five factors," Doc. 7 at 16, these generic considerations essentially amount

---

[11] The Defendants' assertion that this almost entirely black neighborhood of nearly 30,000 people has a "reputation" for armed street robberies is not a fact alleged by the Plaintiffs.  The Defendants are free in this litigation to attempt to prove the truth of that highly dubious assertion to the extent that they believe it to be relevant.

[12] The Defendants also claim, consistent with Defendant Pugh's deliberately misleading factual assertion in the warrant application, that they believed that there were "39 additional" rounds of ammunition in the home.  This is not based on any actual evidence, but on Defendant Pugh's false statement, *see* Doc. 1 at ¶ 18, that ammunition is only purchased in bricks of 50 in the District and that there were 11 bullets in the gun found on Mr. Pitts.  As the Plaintiffs allege in their Complaint, this assertion was false.  In any case, it does nothing to help the Defendants show exigent circumstances here for the reasons discussed in this Section.

to an argument that knocking is not required—and forcibly breaking into a home is allowed—when investigating a gun possession offense in a dangerous neighborhood. This argument flies in the face of clearly established law.

The Defendants cite only *Richards v. Wisconsin*, 520 U.S. 385, 387 (1997), to support their argument. It is impossible to read *Richards* and the rest of the applicable caselaw and come to the conclusion that a no-knock forcible entry was reasonable here. The Defendants do not cite a single case holding that a no-knock entry could possibly be justified on these facts.

As a preliminary matter, *Richards* itself directly contradicts the Defendants' argument. In *Richards,* the Court gave some examples as to why, even though felony drug investigations are "frequently" dangerous for police, the Court refused to categorically sanction no-knock entries of places where active drug selling was occurring: "a search could be conducted at a time when the only individuals present in a residence have no connection with the drug activity and thus will be unlikely to threaten officers or destroy evidence." 520 U.S. at 393. That is exactly the case here. The Defendants had *already arrested Tyrone Pitts* and had no belief that Patrice or Michael Pitts, his relatives, were involved in the criminal activity and no information that these innocent relatives would be dangerous to police.[13]

In *Youngbey v. March*, 676 F.3d 1114, 1120 (D.C. Cir. 2012), which the Defendants do not cite, the D.C. Circuit criticized the same kind of arguments. *Youngbey* explained that the knock-and-announce rule is important because it "protects against personal injury that may result from violence by a surprised resident and the destruction of property that may result from forced entry, and it preserves "those elements of privacy and dignity that can be destroyed by a sudden

---

[13] In *Richards*, forcibly entering a motel room out of which drugs were being actively sold was permissible on the facts because, after officers knocked and were recognized, the suspect slammed the door in their face and retreated into the apartment, where he could easily have disposed of the drugs.

entrance." *Id.* at 1119; *see also Richards*, 520 U.S. at 393 n.5 ("[T]he individual interests implicated

by an unannounced, forcible entry should not be unduly minimized."); *United States v. Banks*, 540

U.S. 31, 41 (2003) ("One point in making an officer knock and announce, then, is to give a person

inside the chance to save his door. That is why, in the case with no reason to suspect an immediate

risk of frustration or futility in waiting at all, the reasonable wait time may well be longer when

police make a forced entry, since they ought to be more certain the occupant has had time to answer

the door.").[14] *Youngbey* discussed at length why the Supreme Court had rejected exceptions to the

knock-and-announce rule that are based on "general categories of criminal behavior." *See*

*generally id.* at 1120.  As a result, even in cases involving "armed bank robbers who are, by

definition, likely to have weapons," *id.*, police may not dispense with knocking.  Instead, there

must be objective facts to show that, at the time of a particular entry, a sudden forced entry by

police is necessary to preserve their safety or to prevent the destruction of evidence.  *Youngbey*

therefore reiterated the holding in *Richards*: "in each case, it is the duty of a court confronted with

the question to determine whether *the facts and circumstances of the particular entry* justified

dispensing with the knock-and-announce requirement." (emphasis in *Youngbey*).  The police must

show objective facts to believe that "under the particular circumstances, [knocking and

announcing] would be dangerous or futile, or that it would inhibit the effective investigation of the

crime by, for example, allowing the destruction of evidence." *Richards*, 520 U.S. at 394.

    Overwhelming caselaw has applied these principles to rejects the Defendants' position.

The federal courts invariably condemn similarly generalized and baseless attempts to manufacture

exigent circumstances.  In *United States v. Singleton*, 441 F.3d 290, 293-94 (4th Cir. 2006), the

---

[14] Unlike in *Banks*, 540 U.S. at 41, which involved how long police must reasonably wait under circumstances in which their knocking and announcing might lead to the destruction of cocaine evidence, the Defendants here did not even bother to knock or announce themselves *at all* before forcibly bursting into the Plaintiffs' home.

court held that a no-knock entry was not justified by evidence that the suspect had a long criminal history including arrests for firearms offenses and murder, that his apartment was located in "a known open air drug market, having a history of shootings and weapons related violence," statements about the open layout of the apartment complex, and "generalizations" about the violence of drug dealers. The Fourth Circuit explained that Officers did not show that these facts established "a particularized basis to reasonably suspect that knocking and announcing would be met with violent resistance." *Id*. at 293. The court wrote: "[T]he Fourth Amendment countenances neither a blanket rule allowing no-knock searches for drug investigations nor a marginally narrower rule allowing no-knock searches for drug investigations in dangerous neighborhoods." *Id*. at 294 (citation omitted); *see also, e.g.*, *United States v. Granville*, 222 F.3d 1214, 1219 (9th Cir. 2000) (reaffirming previous holdings that generalized opinions about dangerousness cannot substitute for the required showing of exigency, which is "specific information that [the occupant of the home] himself was armed or dangerous" at the time of the warrant execution); *United States v. Moore*, 91 F.3d 96, 98 (10th Cir. 1996) (holding that "this exception applies only when the law enforcement officers in question held an objectively reasonable belief that an emergency situation existed" and that "[t]he mere statement that firearms are present, standing alone, is insufficient."); *United States v. Bates*, 84 F.3d 790, 795 (6th Cir. 1996) (holding that evidence of the presence of firearms in a residence suspected of criminal activity is not enough and that officers must further possess information that the people in the home at the time of the search would be "likely to use a weapon or become violent"); *United States v. Marts*, 986 F.2d 1216, 1218 (8th Cir. 1993) ("The reasonable belief that firearms may have been within the residence, standing alone, is clearly insufficient.").[15]

---

[15] *See also, e.g.*, *United States v. Stewart*, 867 F.2d 581, 585 (10th Cir. 1989) (rejecting no-knock entry and criticizing the use of generalities in attempting to justify exigent circumstances); *Gould v. Davis*, 165 F.3d 265, 272 (4th Cir.

In *Youngbey*, the D.C. Circuit found that the circumstances in that case were "close enough" to those in previously upheld uses of forcible no-knock entry such that a police officer could reasonably have believed a no-knock warrant was permitted. *Id*. at 1123-24. The Court came to that conclusion because officers were investigating a brutal murder, and they sought to search the address where they believed the *suspect*, who had already confessed to a third party of having committed the murder, resided. The officers also sought to locate what they believed to be the dangerous assault rifle that had been used in the murder. Officers also had information that the suspect had premeditated the murder and been "provoked to kill over nothing more than a verbal slight directed at the girlfriend of another individual." *Id.* at 1121.

Even a cursory look at the cases relied on in *Youngbey* in which no-knock warrants have been upheld reveals the unmistakable insufficiency of the objective evidence in this case. *See United States v. Ramirez*, 523 U.S. 65, 68 (1998) (involving a search for a violent escaped prisoner who physically knocked over a sheriff, had twice previously attempted escape, threatened witnesses, vowed not to do prison time, and had access to a large supply of weapons); *United States v. Geraldo*, 271 F.3d 1112, 1118 (D.C. Cir. 2001) (involving an active drug house in which an armed man was inside attempting to protect a stash because of previous robberies); *United States v. Crippen*, 371 F.3d 842 (D.C. Cir. 2004) (involving police only waiting four seconds after knocking when they were entering the home of an armed felon who had acquired a "rocket launcher" seen in the home). None of these cases are "close enough" to the circumstances here.

This case could not be more different. The criminal suspect in this case *was already in police custody*. So was his firearm. There was no brutal murder investigation or information about rocket launchers in the home. Instead, a man had been arrested for holding a firearm in his pocket

---

1998); *Kornegay v. Cottingham*, 120 F.3d 392, 398 (3d Cir. 1997); *United States v. Fluker*, 543 F.2d 709, 717 (9th Cir. 1976).

three days earlier.  The purported goal of the warrant was to search the home of innocent relatives of the suspect in order to obtain evidence of Tyrone Pitts's crime.  Indeed, officers had *already gone to the home* and confirmed Tyrone Pitts's residence with his disabled relative without any threat or difficulty.  Therefore, not only was there no objective evidence that the home would present a violent emergency to officers, but the fact that officers had already gone to the home, knocked on the door, and spoken to Patrice Pitts without incident—obviously learning in that interaction that she could barely stand or move because of her illness—actually suggested the exact opposite.  Patrice Pitts had cooperated with the officers and confirmed that Tyrone Pitts had lived with her before his arrest.  For all of the Defendants' fear mongering about this case involving a gun and about how dangerous large portions of Southeast D.C. are, the facts in this case fall woefully short of the kind of objective, case-specific exigencies that justify refusing to knock. This case simply did not present "a reasonable suspicion of exigency," *Banks*, 540 U.S. at 36.[16]  It is not surprising that the Defendants cannot find a single citation to support their argument.[17]

The Defendants' conclusion that there was a "likelihood that occupants of the apartment were armed and had a propensity towards violent crime," Doc. 7 at 17, is a disingenuous assertion

---

[16] Moreover, Defendant Pugh neither requested nor obtained a no-knock warrant here, even though all of the circumstances that the Defendants now point to were known to Defendant Pugh in advance.  As *Banks* described, a magistrate judge can authorize a no-knock entry if the circumstances warrant it.  Although it is true that "even when executing a warrant silent about that, if circumstances support a reasonable suspicion of exigency when the officers arrive at the door, they may go straight in," 540 U.S. at 36-37, in this case nothing materialized as officers arrived at the door to create any exigency.  To the contrary, the door was unlocked, Ms. Idris was setting down her laptop computer after work, Patrice Pitts was laying down resting, and Michael Pitts was cooking dinner.  Doc. 1 at ¶ 52-60.

[17] The Defendants argue that they were not negligent per se in bursting into the home without first knocking and announcing their presence.  Doc. 7 at 20.  The Defendants argue that D.C. Code § 23-524(a) cannot underpin negligence per se because it merely codified the common law.  *But cf. Banks*, 540 U.S. at 43 (suggesting that the federal statute on which the D.C. Code is based created an "actual refusal" provision).  Even if true, that argument could affect only the applicability of certain defenses.  Regardless of whether the Defendants were negligent per se or merely negligent, the critical inquiry, as Defendants concede, is whether their conduct was "reasonable."  For all of the reasons discussed above, it is obvious that the failure to knock and announce in this case was not reasonable.

on the facts of this case.  Seeking to invoke the power of a federal court to dismiss the civil rights claims of victims of brutal police misconduct requires more than innuendo and uncited assertions.

### B.  The Unlawful Strip Search of Michael Pitts's Genitals

When the Defendants broke into the Plaintiffs' home, they took Michael Pitts—who was not named in the warrant application and not suspected of any criminal activity—from the kitchen, where he had been cooking dinner.  They bound his hands in metal chains, removed his pants, and inspected his genitals and anal cavity in front of his family.

It is difficult to imagine a more significant intrusion by government employees on a person's liberty than bursting into the person's home, binding his hands in metal, and searching his private parts.  *See, e.g.*, *Fate v. Charles*, 2014 WL 2527234 at *6 (S.D.N.Y. June 5, 2014) ("The privacy interest in one's naked body, and one's body cavities, is especially high. A search requiring exposure of these areas is undoubtedly extreme.").  According to the government of the District of Columbia, Doc. 7 at 18, however, its employees can do exactly that, even to a person about whom they have absolutely no suspicion of criminal activity.  This assertion of power by our municipal government is a significant event.

The Defendants move to dismiss Michael Pitts's Fourth Amendment claim without citing a single case in which any court has ever upheld the strip search of an innocent person during the execution of a search warrant.

As a preliminary matter, the Defendants ignore that the reason that they were supposedly in the Plaintiffs' home was to find evidence of Tyrone Pitts's *gun possession* offense.  The warrant that issued specifically listed a variety of gun-related items and documents.  The Defendants do not argue, and therefore concede, that there is any evidence to suggest that any of the gun-related items sought would have been found in the private areas of Michael Pitts's body as he was cooking

dinner for his family.  Because the search exceeded the scope of the search authorized by the warrant, it violated the Fourth Amendment.  *Horton v. California*, 496 U.S. 128, 140 (1990) ("If the scope of the search exceeds that permitted by the terms of a validly issued warrant or the character of the relevant exception from the warrant requirement, the subsequent seizure is unconstitutional without more.").  That is sufficient in itself to reject the Defendants' Motion.

Moreover, Defendant Pugh had explicitly asked, in his warrant application, to search "any occupants located within the premises."  Doc. 1-1 at 4.  The judge, however, did not authorize such a search and instead authorized only a search of the premises for gun related items.  Doc. 1-1 at 1. Despite knowing that they had failed to obtain the approval to search the occupants of the home in advance, the Defendants proceeded not only to search Michael Pitts, but to conduct a strip search of his naked genitals and anal cavity in his own home.  No reasonable officer could have believed that this deviation from the particularities described in the warrant was reasonable.  *See, e.g., United States v. Heldt*, 668 F.2d 1238, 1257 (D.C. Cir. 1981) ("When investigators fail to limit themselves to the particulars in the warrant, both the particularity requirement and the probable cause requirement are drained of all significance as restraining mechanisms, and the warrant limitation becomes a practical nullity. Obedience to the particularity requirement both in drafting and executing a search warrant is therefore essential to protect against the centuries-old fear of general searches and seizures."); *Groh v. Ramirez*, 540 U.S. 551, 563 (2004) ("It is incumbent on the officer executing a search warrant to ensure the search is lawfully authorized and lawfully conducted.").  Indeed, such a strip search is not even permitted without justification *even when officers have arrested a person*, let alone merely interacting with an innocent person.[18]

---

[18] *See, e.g.*, *Stearns v. Clarkson*, 615 F.3d 1278, 1282 (10th Cir. 2010) (holding that officers were not entitled to qualified immunity because "it is also clearly established that a detainee who is not placed in the general prison population cannot be strip searched if the searching officer does not at least have reasonable suspicion that the detainee possesses concealed weapons, drugs, or contraband") (quotations removed).

The Third Circuit confronted a similar case in *Doe v. Groody*, 361 F.3d 232, 239 (3d Cir. 2004), in which two occupants of a home were taken to a bathroom and partially strip searched. The Third Circuit first explained that such searches must be authorized by the warrant. *Id*. at 238. The court noted, however, that the "face of the search warrant here, however, does not grant authority to search either Jane or Mary Doe." *Id*. The court held:

> [T]he language of the warrant is inconsistent with the language of the affidavit, because the former does not grant what the latter sought—permission to search "all occupants" of the house. That is not a discrepancy as to form; it is a difference as to scope. And it is a difference of significance.

*Id*. at 240. Moreover, as *Groody* recognized, even had the warrant authorized the search of particular occupants of the residence, it would have to state probable cause for those searches, for example information establishing reason to believe that Michael Pitts would be hiding evidence relating to Tyrone Pitts's gun possession offense on his person. *Cf. id.* at 242 ("We look in vain for any assertion that narcotics dealers often hide drugs on family members and young children."). Moreover, even had there been evidence in the warrant that Michael Pitts was likely to be holding evidence of specific gun crimes on his person when the Defendants raided the home, none of that would have justified a strip search of his private areas in front of his family.

The Defendants' arguments are completely inapposite and devoid of any support in American law. They first try to justify the search by citing *Michigan v. Summers*, which even the Defendants acknowledge concerns the authority to detain occupants of a house during a warrant execution and not the authority to *search* them. Doc. 7 at 17. Then, citing classic Supreme Court cases about searches incident to *arrest*, they claim: "the same reasons that support searches incident to arrest support searching individuals during the execution of a search warrant." Doc. 7 at 17. This radical statement of law has no citation or explanation and should be rejected summarily for that reason alone. It is also flatly wrong. The Supreme Court long ago held the opposite:

37

> Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be.

*Ybarra v. Illinois*, 444 U.S. 85, 91 (1979).[19]

### C.  The Unlawful and Extended Searches for Drugs

In Count Seven of the Complaint, Doc. 1 at ¶ 93, the Plaintiffs allege that the Defendants impermissibly extended the scope and duration of the search authorized by the warrant by turning the search into a search for narcotics.  Because the Defendants do not address this claim, let alone make an argument for its dismissal, the argument is waived.

In any case, the claim has obvious merit.  As argued above, the D.C. Circuit in *Heldt* and the Supreme Court in *Horton* held that exceeding the scope of a warrant violates the Fourth Amendment.  The Plaintiffs alleged in the Complaint that the Defendants repeatedly prolonged the temporal duration of the home search and expanded its physical scope in an obsessive mission to find drugs.  Doc. 1 at ¶ 66-77.  The Defendants screamed at the Plaintiffs and Ms. Idris to show them where they could find drugs, repeatedly questioned them about drugs, strip searched Mr. Pitts in search of drugs, and put their hands into the food that Mr. Pitts was cooking for his mother and partner after taunting him when they did not find any drugs in the home.

### D.  Illegal and Extended Handcuffing of the Disabled Patrice Pitts and Michael Pitts

The Plaintiffs allege that the Defendants handcuffed them without any justification for the entire duration of their comprehensive search of the home.  The Defendants handcuffed the

---

[19] The Defendants cite two irrelevant cases, *Los Angeles County, California v. Rettele*, 550 U.S. 609, 615-616 (2007), which had nothing to do with any kind of search and was instead about the exigencies in briefly detaining occupants of a home during a potentially dangerous raid, and *United States v. Murray*, 22 F.3d 1185 (D.C. Cir. 1994) (unpublished), an unpublished case that stated that a strip search was allowable when officers were *arresting* a person for a drug offense and watched him trying to stuff the drugs into his rectum.  *Murray* is clearly irrelevant: no one was conducting a valid arrest of Michael Pitts, and no one observed him shoving drugs into his rectum.

Plaintiffs even though the Plaintiffs were not suspected of any illegal activity and even though they remained calm and non-threatening throughout.  The Defendants forced the disabled Ms. Pitts out of her bed and handcuffed her even though she can barely stand or move and requires a cane to walk slowly inside her own apartment. Doc. 1 at ¶ 55-57, 61, 93.  Because no reasonable officer could have believed that binding the Plaintiffs' bodies in metal cuffs was a necessary use of force under the circumstances, the Plaintiffs' claims should not be dismissed.

In *Graham v. Connor*, 490 U.S. 386, 395 (1989), the Supreme Court held that all claims of excessive force must be analyzed under the Fourth Amendment, inquiring whether the use of force is "reasonable" after a "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id*. at 396 (quotations removed).  In making this determination, the Court listed several factors to guide the application of this standard, explaining that courts must devote

> careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

*Id*.  This standard is not intended to micromanage every action of police officers based on hindsight; it recognizes that "police officers are often forced to make split-second judgments." *Id*. at 397.  But it also plays an important role in protecting ordinary people from unnecessary and harmful police conduct that could be avoided.  It examines the particular circumstances and asks whether there were objective reasons for the behavior of police and, by requiring objective reasons, ensures that our society can guard against the everyday normalization of unjustified police violence.  Because this standard is based on "careful" scrutiny of particular facts and circumstances, it is meant to avoid categorical rules, such as that handcuffing people during search warrant raids is always permitted or never permitted.

These factors all cut strongly against the Defendants here.  The crime at issue, *which had occurred three days earlier*, was not a violent murder or physical assault, but the simple possession of a firearm, which many view as constitutionally protected activity, especially if a neighborhood is dangerous as the Defendants claim.  More importantly, the suspect, Tyrone Pitts, had already been taken into custody (along with his gun), and there was no indication that any dangerous activity was occurring when police arrived.  Neither the disabled Patrice Pitts, nor Michael Pitts, who was cooking dinner for her, posed any "immediate threat."  They were calm and polite, as they had been when officers had come to the home previously to verify Tyrone's address.  Neither of them had offered the slightest bit of resistance.  Doc. 1 at ¶ 54, 58.  Any reasonable officer would have realized that this situation should have been handled with far less force.  The decision of the Defendants, instead, to handcuff them, strip search Michael, destroy property, prolong the humiliating experience, and taunt the family,[20] is not the reasonable conduct of government agents that the law shields from liability.  *Los Angeles v. Rettele*, 550 U.S. 609, 614 (1989) ("Unreasonable actions include the use of excessive force or restraints that cause unnecessary pain or are imposed for a prolonged and unnecessary period of time.");[21] *Motley v. Parks*, 432 F.3d 1072, 1089 (9th Cir. 2005) ("The use of a force against a person who is helpless or has been subdued is constitutionally prohibited."); *Turmon v. Jordan*, 405 F.3d 202, 208 (4th Cir. 2005) ("We conclude…it would have been clear to a reasonable officer that he could not point his gun at an individual's face, jerk him from his room, and handcuff him when there was no reasonable

---

[20] The approach of officers is summed up by one of the Defendants repeatedly telling Ms. Idris to shut up when she complained that the handcuffs were hurting her and then his deliberate dropping of her employer's computer on the floor.  Doc. 1 at ¶ 69-71.

[21] In *Rettelle*, police had information that the at-large suspect they were seeking was armed.  That alone justified treating the situation with significant caution and aggressiveness.  When police came into the bedroom looking for the person, they saw two people in bed, and the Court noted that, when searching for an armed person, it can be reasonable to remove people from bed because weapons can be hidden in a bed.

suspicion that any crime had been committed, no indication that the individual posed a threat to the officer, and no indication that the individual was attempting to resist or evade detention.").

The Defendants point only to *Muehler v. Mena*, 544 U.S. 93, 100 (2005), to support their position. Conceding that officers cannot handcuff people routinely in home searches, the Defendants argue that, like *Mena*, this was "no ordinary search." Doc. 7 at 18-19. The Defendants can only make that claim by avoiding the dispositive facts and holding of *Mena*. In *Mena*, the Court held, under the totality of the circumstances, that the detention was reasonable because probable cause existed that known "wanted gang" members lived in the home, that the home also contained weapons, and that the "search of a gang house for dangerous weapons" was conducted in the aftermath of a violent drive-by shooting. *Id*. at 100. The Court noted that, in the wake of this investigation into a violent gang-related crime, handcuffs were surely an additional intrusion on liberty, but that *Mena* was "no ordinary search."

In contrast, the search in this case was about as ordinary as searches get. The suspect of the crime, as well as his weapon, were both already in custody. Police had gone to the home already and spoken with the disabled Ms. Pitts, who readily cooperated and told them that Tyrone had lived with her before his arrest. There was no indication that Tyrone Pitts, let alone anyone in the home after his arrest, had committed any violent crime. The home had not been suspected of any involvement in any crime. This search of a gun arrestee's home was so ordinary that the MPD conducted 56 of them in the year surrounding the search of the Plaintiffs' home.

The right to detain people during a search, *Michigan v. Summers*, 452 U.S. 692, 702-703 (1981), just like the right to detain a person during a *Terry* stop, does not automatically bring with it the right to handcuff anyone that police encounter in a home search no matter what. Binding a person's body in metal chains is "undoubtedly a separate intrusion" on liberty that requires at least

some justification.  *See Mena*, 544 U.S. at 99.   Contrary to the Defendants' arguments, the federal courts have been clear that automatic or prolonged handcuffing is not reasonable.   *Baker v. Monroe*, 50 F.3d 1186, 1193-94 (3d Cir. 1995) (handcuffing for twenty-five minutes and pointing guns at individuals not under criminal suspicion constitutes a Fourth Amendment violation); *See, e.g.*, *Heitschmidt v. City of Houston*, 161 F.3d 834, 837–38 (5th Cir.1998) (holding that handcuffing and denying a plaintiff bathroom breaks during the search of his residence was not within the scope of a permissible detention under *Summers*); *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994) ("A detention conducted in connection with a search may be unreasonable if it is unnecessarily painful, degrading, or prolonged, or if it involves an undue invasion of privacy. Detentions, particularly lengthy detentions, of the elderly, or of children, or of individuals suffering from a serious illness or disability raise additional concerns.").

Justice Kennedy, the controlling vote in *Mena*, even wrote separately to ensure that "handcuffing during searches becomes neither routine nor prolonged."  544 U.S. at 102 (Kennedy, J., concurring).  That warning runs directly counter to the Defendants' statements during the raid that they "had" to handcuff "everyone."  Doc. 1 at ¶ 69. Upholding the suspicionless handcuffing in this case, in which police possessed not a single fact suggesting that anything dangerous was happening in the home and many facts suggesting that the home was full of calm and innocent people, would do exactly what Justice Kennedy feared and what *Mena*'s holding made clear is only justifiable if objective circumstances create a reasonable need for such measures.

The uptick in this kind of brutal police activity as MPD officers become equipped with increasing amounts of high-grade military weaponry and dramatically increase their SWAT team deployments,[22] does not make it objectively reasonable.  The Supreme Court and the D.C. Circuit

---

[22]*See, e.g.*, Cops or Soldiers?, The Economist, May 22, 2014, *available at* http://www.economist.com/news/united-states/21599349-americas-police-have-become-too-militarised-cops-or-soldiers; *see also* War Comes Home, ACLU

have never wavered from the fundamental principle that specific reasons particular to the situation must justify additional intrusions on protected Fourth Amendment liberties.

### E.  The Brutal and Repeated Seizures, Searches, and Taunts Shock the Conscience

The Plaintiffs allege repeated and deliberate violations of their established rights, including the forced entry without knocking; the strip search; the painful handcuffing without justification; the taunts; the accusations of criminality; the threats to lose their home; the violent treatment of Mr. Pitts' partner and her possessions; the deliberate destruction of the family's dinner; and the threats to Michael Pitts that if he did not disclose his supposed drugs, then officers would arrest his romantic partner.   Doc. 1 at ¶ 92-93.

This appalling conduct is the behavior of armed gangsters, not solemn public servants. Taken together, these deliberate actions, repeated against the humiliated and vulnerable Plaintiffs one after another, "shock the conscience." *Rochin v. California*, 342 U.S. 165 (1952).  The Due Process Clause protects human beings living in this country from this kind of flagrant, intentional, and deplorable conduct that was deliberately "intended to injure in some way unjustifiable by any government interest." *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998).  Because the Defendants do not address this Fifth Amendment claim, it should not be dismissed.

### III.   Municipal Liability

In Count Four of the Complaint, *see* Doc. 1 at ¶ 86-87, the Plaintiffs allege that the District is liable for the constitutional violations that they suffered in Counts One and Two of the Complaint because of the MPD's failure properly to train and supervise its officers concerning the planning and execution of home search warrants.   As a result of the content of MPD's training, which

---

(June 2014), *available at*  https://www.aclu.org/sites/default/files/assets/jus14-warcomeshome-report-web-rel1.pdf; Rise of the Warrior Cop, Wall Street Journal, August 7, 2013, *available at* http://online.wsj.com/news/articles/SB10001424127887323848804578608040780519904.

Defendant Pugh cited in his application, as well as the failure properly to supervise its officers, the MPD created a policy, pattern, and practice of similar constitutional violations in the planning and execution of at least 56 gun possession "training" and "experience" based home raids in the one-year period surrounding the search of the Plaintiffs' home.  *Id.* at ¶¶ 79-84.

The only argument made by the District of Columbia concerning the municipal liability claim under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), is that the Plaintiffs have not alleged an underlying constitutional violation with respect to the validity of the warrant in this case.  Doc. 7 at 19.  Because the Defendants make no other argument in their Motion and because the Plaintiffs have, as explained above, sufficiently alleged that the warrant was constitutionally invalid because of its reliance on insufficient, false, and misleading statements of "training" and "experience," the Defendant District of Columbia's Motion with respect to the Plaintiffs' municipal training and supervision claims must be denied.

## IV.   Conclusion

For the reasons stated above, each of the Plaintiffs' claims in the Complaint clearly contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Defendants' Motion should be denied.

Respectfully submitted,

   */s/ Alec Karakatsanis*
Alec Karakatsanis (D.C. Bar No. 999294)

Equal Justice Under Law
916 G Street, NW #701
Washington, D.C. 20001
(202) 681-2409
alec@equaljusticeunderlaw.org

*Attorney for the Plaintiffs*