**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PATRICE PITTS,<br>3921 4th Street SE #2<br>Washington, D.C. 20032,<br><br>MICHAEL PITTS<br>3921 4th Street SE #2<br>Washington, D.C. 20032,<br><br>      Plaintiffs.<br><br>v.<br><br>THE DISTRICT OF COLUMBIA<br>1350 Pennsylvania Avenue NW<br>Washington, D.C. 20004,<br><br>Officers Mark Pugh, Leroy Rollins,<br>Sean Hodges, Tony Covington, James<br>Chastanet, Marcus Stevens, Seth Anderson,<br>Sydney Catlett, Kim Togans, James Little,<br>Ursula Tutt, Kristopher Plumley, John Doe<br>Officers.<br><br>Metropolitan Police Department<br>300 Indiana Avenue, NW<br>Washington , DC 20001<br><br>      Defendants. | Case No.  1:14-cv-1319-TSC<br><br>Jury Trial Demanded |

## FIRST AMENDED COMPLAINT

### Nature of the Action

1. Patrice Pitts, a 56-year-old disabled woman, lives with her son Michael in a small apartment in Southeast Washington. On the evening of March 26, 2013, Patrice Pitts was resting quietly in her bed when, without warning, at least ten heavily armed officers from the Metropolitan Police Department ("MPD") busted through and broke her front door. The officers forcibly

handcuffed Ms. Pitts, who has difficulty moving around her own apartment, even with the help of her cane. The officers yanked Ms. Pitts from her bed and brought her into her living room. They also took Michael Pitts from the kitchen, where he had been cooking dinner for his mother. The officers brought Michael to the living room and pulled down his pants. The officers then examined and probed his naked genitals and anal cavity, pushed him to the ground, and handcuffed him on the floor of his own home while his family was forced to watch.

2. This violent home invasion by MPD officers was based on an improperly and fraudulently obtained search warrant purportedly seeking firearms-related items.

3. The Defendant MPD officers had no evidence that the home had been involved in any illegal activity or that it contained any firearms-related contraband. MPD officers had no evidence that Ms. Pitts or her son were engaged in any criminal or dangerous activity inside their home that night.

4. The publicly available search warrant application lacks even a single particularized fact suggesting that guns, ammunition, or other contraband would be present in the Pitts's home. Instead, the search warrant application is based only on two things: (a) three days earlier, several MPD officers had arrested Ms. Pitts's uncle, 64-year-old Tyrone Pitts, while he was standing on the street and (b) the MPD officers' generic and conclusory claims that, based on their "training" and "experience," they are likely to find guns, ammunition, and other firearms accessories in a person's home after an arrest for gun possession is made away from the home.

   a. This Court has explicitly rejected the proposition that arresting someone away from the home for gun possession can justify a search of the person's home, absent specific and particularized facts that evidence of illegal activity would likely be found in the home. *United States v. Hopkins*, 128 F. Supp. 2d 1, 7 (D.D.C. 2000).

2

    b. In cases, such as this one, where MPD officers seek a search warrant without particularized facts and based only on their claimed "training" and "experience," searches rarely produce evidence of the illegal activity that police allegedly seek. For example, records produced by MPD officers show that, in the one-year period surrounding and including the raid of the Pitts's home, 91% of such warrants searching for guns in the District failed to find any guns in the home.

5.     No guns, ammunition, or other contraband were found during the Defendants' violent home invasion of the Pitts family residence. During the course of the unlawful raid, officers humiliated, traumatized, verbally taunted, and physically injured vulnerable people completely innocent of any wrongdoing.

6.     The unlawful actions of the local government agents in this case have become a frightening reality for impoverished families of color in the District. According to the Metropolitan Police Department, a family can have their home invaded, have the most private aspects of their lives searched, and have their genitals and anal cavity examined by government agents, all without a single particularized fact connecting their persons or home to any criminal activity. What happened to the Pitts family raises serious questions about the systemic misconduct and recklessness of the Metropolitan Police Department and its agents in obtaining search warrants and executing home raids in the District of Columbia.[1]

**Jurisdiction and Venue**

7.     This is a civil rights action arising under 42 U.S.C. § 1983 and the Fourth and Fifth Amendments to the United States Constitution. This Court has jurisdiction pursuant to 28 U.S.C.

---

[1] The allegations in this Complaint are based on personal knowledge as to matters in which the Plaintiffs have had personal involvement and information and belief as to all other matters.

§§ 1331 and 1343. This Court has supplemental jurisdiction to adjudicate Plaintiffs' claims under the laws of the District of Columbia under 28 U.S.C. § 1367 because those claims form part of the same case or controversy and arose out of the same transaction and occurrence.

8. Venue in this Court is proper pursuant to 28 U.S.C. § 1391.

### Parties

9. Plaintiff Patrice Pitts is a 56-year-old resident of the District of Columbia. Plaintiff Michael Pitts is a 37-year-old resident of the District of Columbia.

10. The District of Columbia is the municipal entity that operates the Metropolitan Police Department and that trains and supervises the Defendant officers.

11. Defendant Officer Mark Pugh prepared and swore under oath the search warrant application and participated in the planning and execution of the home raid. He also participated in the unlawful stop of Tyrone Pitts (Patrice Pitts's uncle) on which the home search warrant was ostensibly predicated.

12. Leroy Rollins, Sean Hodges, Tony Covington, James Chastanet, Marcus Stevens, Seth Anderson, Sydney Catlett, Kim Togans, James Little, Ursula Tutt, Kristopher Plumley, and John Doe Officers are the MPD officers who participated in the planning and execution of the home raid. The named Defendants and the District of Columbia are in possession of the full names and badge numbers of any other Defendant John Doe Officers, and their full identities can be easily discovered. All of the Defendant officers are sued in their individual capacities.

### Factual Background

#### The Clear Lack of Probable Cause

13. The warrant application made by Defendant Pugh to raid the Pitts's home plainly lacked probable cause. *See generally* Exhibit 1 (Sworn Application by Officer Pugh). No

reasonable officer could have believed that it established probable cause to search the family's home.

14.  The warrant application describes an incident on March 23, 2013, in which three officers on patrol saw Tyrone Pitts standing on the street.  According to the warrant application, when officers got out of their car and announced their presence, Mr. Pitts appeared nervous.  The officers then asked Mr. Pitts if he had anything illegal on him and, according to the warrant application, Mr. Pitts supposedly spontaneously declared: "No, you can check."

15.  The officers searched Tyrone Pitts and immediately found a handgun on his waist. The officers asked Tyrone Pitts for his "biographical information," and he informed the officers that he lived at 3921 4th Street SE, Apartment 2.  Officers later confirmed with Patrice Pitts that he stayed there.  The warrant application went on to request permission to search the home at 3921 4th Street SE, Apartment 2, and it also requested permission to search individuals living at the home.

16.  The warrant application does not mention a single particularized fact that would create a likelihood of finding guns or other gun-related contraband in the home.

17.  Lacking any actual facts connecting the home to any criminal activity, Defendant Pugh asserted in his warrant application that, based on his "training" and "experience," gun possessors "almost always" keep in their homes a variety of gun-related materials, including "laser gun sights," "targets," "ballistic body armor," "shooting range receipts," "gun maintenance records," and a number of additional items and documents relating to gun ownership. Exhibit 1 at 2.

18.  Defendant Pugh also swore that, because bullets are only sold in bricks of 50 at stores in Maryland, Mr. Pitts "must have" additional bullets at the home because his firearm

5

contained only 11 bullets.  Citing the same MPD "training" and "experience," however, a different MPD officer claimed under oath weeks earlier that, because one cannot legally purchase bullets in the District, "there are often places where you can buy loose bullets or individual bullets from other gun possessors."[2]

19.     Defendant Pugh also swore that, without knowing anything about the home, police were likely to find additional firearms in the home because it is "not uncommon" for gun possessors to possess additional guns in their homes.

20.     Seeking to search through any and all electronics found in the home, the warrant application declared that gun possessors "like" to take pictures of themselves, that gun possessors like Mr. Pitts "commonly" photograph themselves with guns, and that such people "usually" keep those photographs on their personal computers and cell phones.  On the basis of this statement, the Defendants sought to search through the entire memory of any computers or phones found in the home.

21.     Personal computers can contain the most personal, private, and intimate details of a person's or family's life.   The same can be true of cell phones.

22.     Having never been in the home and having no evidence connecting the home to criminal activity other than arresting a person who lived there three evenings earlier, Defendant Pugh did not even know whether the family owned a computer, a digital camera, or a smart phone, much less that those devices contained evidence of gun crimes.

---

[2] These contradictory and self-serving statements of "training" and "experience," are common. For example, warrant application 2013 CRW 000714 swears under oath: "in my experience, *almost never are bullets sold loose or individually in Washington, D.C.*, so all bullets found in a gun recovered by police were originally bought in brick or box form." (Emphasis added).  Warrant application 2013 CRW 000105 swears under oath: "in general, there are no places you can legally buy ammunition in DC. Due to this, *there are often places where you can buy loose bullets or individual bullets* from other gun possessors." (Emphasis added).

23. According to the Defendants, simply by virtue of sharing a home with a person who is stopped on the street with a firearm (or by being in the home when it is raided), a person like Patrice Pitts may have her entire physical and electronic life searched by government agents. This intrusive search is authorized not by any evidence that the person has ever been involved in illegality, but by unsubstantiated and vague claims of "training" and "experience" that the person stopped on the street may have taken photographs of himself with guns because such people "like" to do so.

24. Similarly, according to the Defendants, Michael Pitts can have his home searched, all of his and his mother's electronic devices searched, his anal cavity probed, and his genitals examined by government employees, without a single particularized fact about him, his mom, or his home.

25. Although the application also sought permission to search the persons in the home, the judge only authorized a search of the home (not of the people in the home). The warrant did not authorize Defendants to conduct a strip search of an innocent occupant of the apartment.

26. No guns, ammunition, or other contraband were found in the Defendants' violent home invasion of the Pitts family residence.

27. The warrant application in this case lacked a single particularized fact justifying a search of Patrice Pitts, Michael Pitts, or their home. Other than vague assertions of "training" and "experience," the warrant application presented no actual evidence that the home of Patrice and Michael Pitts had ever been linked to any criminal activity or presently contained any gun-related items.[3] The application obviously lacked probable cause for the Defendants' search.

---

[3] Furthermore, the warrant application stated that Tyrone Pitts did not have valid registration documents for a firearm, which made his possession of the firearm on the street illegal. However, the warrant application failed to include any information concerning whether any of the other

### The Warrant Relied on False and Misleading Statements

28.     Lacking any specific facts to justify the home search, the Defendants relied on generic and conclusory statements about "training" and "experience."  In addition to clearly failing on their face to establish probable cause to believe that a raid of the family's home would produce the items sought, the sworn statements of "training" and "experience" were also false and misleading.

29.     Defendant Pugh's claim that police were likely to find the firearms-related items because of the habits of such criminals was knowingly and recklessly false.  In fact, based on publicly available records, it was far more likely than not that the Defendants would *not* find each of the items sought.

30.     During the one-year period surrounding and including the Defendants' violent raid of the Pitts's home, MPD search warrant inventory returns reveal that MPD searches seeking firearms based on a street arrest combined with statements of "training" and "experience" fail 91% of the time.  Such searches seeking ammunition fail 74% of the time.  Such searches seeking documentary or photographic evidence of gun possession fail at least 94% of the time.  Not only did Defendant Pugh omit these facts from his warrant application, but he actually claimed that it would be likely that he would find guns, ammunition, other contraband, and photographic evidence.

31.     By making such claims to the Superior Court judge about what they were likely to find without telling the judge that, based on MPD's own actual experience, it was far more likely

---

members of the household possessed valid licenses to possess a firearm or ammunition.  Thus, while the warrant application strangely states that possession of ammunition is "almost always a crime in Washington, D.C.," Exhibit 1 at 3, officers did not actually present to the issuing judge any evidence that any of the items sought would be illegal if found in the home.

than not that the Defendants would *not* find such materials, Defendant Pugh misled the issuing judge.

32.     The high failure rate of such "training" and "experience"-based searches is not surprising given what was omitted from the issuing judge. Defendant Pugh failed to inform the judge about other material facts in his possession, such as that many firearms—particularly because of the District's long history of almost uniform prohibition on guns and the inability of many District residents to validly purchase a firearm—are passed and traded by individuals without documentation or records, and without the person possessing any of the receipts or accoutrements of legal gun ownership.

33.     Defendant Pugh failed to inform the issuing judge that gun possessors in the District (particularly low-income gun possessors or people involved in crews and gangs) frequently share guns with multiple other residents and therefore often possess firearms on the street that they do not actually own. Had this information been presented, it would have undermined the officer's sworn assertions about what police were likely to find in the Pitts's home on March 26.

34.     Defendant Pugh also omitted from the warrant application that the MPD trains its officers that gun possessors commonly possess the items Defendant Pugh sought in a variety of other places that are *not* their homes. Indeed, other MPD officers have repeatedly sworn, based on their "training" and "experience," to different Superior Court judges in other search warrant applications, before and after the application in this case, that illegal gun possessors in the District commonly stash their firearms and accessories in safe places that are *not* their home. *See, e.g.*, 2012-crw-3107 (explaining, based on the same "training" and "experience," that "gun possessors," in addition to potentially keeping their weapons on their person or in their home, typically hide their firearms and gun accessories in their cars, in "hangouts," in the homes of friends or family,

or "somewhere available to them."); *see also, e.g.*, 2013-crw-426 (explaining, in addition to homes and residences of friends and associates, that such items are often maintained, in "vehicles," in "business locations," in a stash house, or in a safe house); 2013-crw-510 (same). Defendant Pugh flatly contradicted this known fact by swearing, without particularized facts, that guns would likely be found in the Pitts's home. Including this fact would have eviscerated any purported particularized justification for searching the 3921 4th Street address.[4]

35. The commonly sworn MPD assertions about the other likely locations of the gun-related items—and the empirical evidence that support them—reveal a critical deficiency: when MPD officers stop a person on the street and find a firearm, MPD officers have no idea whether they are likely to find any particular related items in the person's family home several days later because the person may not possess other evidence of gun ownership and because, if the person does possess such evidence, MPD officers know that the evidence may be kept in a variety of other places.

36. The Defendants in this case attempted to turn a street arrest into an automatic raid and search of a home. To accomplish that, the Defendants relied on vague, facially insufficient, unsubstantiated, and grossly misleading and intentionally incomplete statements of "training" and "experience."

37. Through training its officers to use these statements of "training" and "experience" and by supplying the content of that "training," the MPD has begun an initiative to conduct violent

---

[4] Furthermore, Defendant Pugh vaguely asserted, again based on his "training" and "experience," that items related to firearms (to the extent they exist at all in a home) are not disposed of by family members and that those items "will remain at the arrested individual's home for a considerable period of time after an arrest." *Id*. at 3. These statements of "training" and "experience" are unsubstantiated by any empirical evidence and are contrary to the statements and testimony of other MPD officers relying on the same "training" and "experience."

home raids, sometimes at multiple homes, in every situation in which officers find a firearm in the possession of a person anywhere in the District, based not on any actual police work or evidence linking the home to a firearm, but based on false and misleading statements about the habits of a generic category of people that it labels "gun possessors."

38. The MPD trains its officers that, based on bare bones affidavits like Officer Pugh's and assertions of "training" and "experience" like the ones he made, any MPD officer is able to turn any gun arrest anywhere in the District into an automatic home raid, even though officers know that they are unlikely to find the evidence that they claim to seek.

39. The MPD has adopted a pattern, policy, and practice of instructing its officers to obtain and execute search warrants at the alleged residences of people on whom they find firearms during traffic and street stops.  The MPD employs this pattern, policy, and practice despite the obvious lack of any evidentiary connection to the residence and rulings from this Court that such subsequent home raids based solely on possession of a firearm somewhere away from the home clearly lack probable cause.

40. In the one-year period surrounding the execution of the warrant in this case, MPD officers (including dozens of officers and supervisors from police districts throughout the City) employed materially similar statements based on the MPD's "training" and their "experience" after street arrests involving firearm possession in order to execute at least 56 home searches; these MPD raids resulted from incidents in which police claimed to find firearms during a street stop but presented no other evidence linking the home to any criminal activity.

41. MPD officers are trained by the MPD to substitute these and materially similar statements of "training" and "experience" for traditional evidence when they want to search a particular location but lack any evidence about the location.

**The Warrant Application Contained Additional
False Statements Designed to Hide an Unlawful Search**

42. The warrant application claims that three MPD officers patrolling to suppress robberies encountered Tyrone Pitts on the street.

43. The application alleges that Mr. Pitts, after being approached and questioned by officers, spontaneously declared that the officers could search him for weapons—a declaration that the warrant application claims he made knowing that he was holding an illegal weapon. That assertion was false.

44. In reality, Tyrone Pitts was forcibly stopped on the street by MPD officers and immediately frisked and searched without ever providing consent to any search.

45. The warrant application thus falsely asserts that the initial discovery of the gun was lawful because the discovery was the result of a consensual search. The false and misleading recounting of the initial stop led the issuing judge to believe that the discovery of the gun was consensual and not the fruit of an unconstitutional seizure. Had the non-consensual nature of the search been described to the issuing judge, the judge would have been compelled to ignore the fruits of that search when considering probable cause. Had the fruits of the unlawful stop and search of Mr. Pitts (including the firearm and Mr. Pitts's "biographical information") been omitted from the warrant application, there would have been no information about which Defendant Pugh could even have based his insufficient, false, and reckless assertions of "training" and "expertise." No warrant would have issued.

**The Violent Raid of the Pitts's Home**

46. The Defendants invaded the Pitts's home on March 26, 2013, failing to knock and announce their presence prior to breaking in.

47. No exigent circumstances justified the failure to knock and announce.

48. Knocking and announcing would not have been futile and would not have created a risk of physical violence.

49. The Defendants were neither actually nor constructively refused admittance to the house before they forced entry.

50. The Defendants acted with reckless indifference to and deliberate disregard for the rights of Patrice and Michael Pitts when they failed to knock and announce, failed to wait a reasonable period of time, and broke down the door to the Pitts's home.

51. Failing to knock and announce creates a high degree of risk and has led to many serious incidents of needless injury because innocent citizens reasonably fear that their home is being invaded by criminals who are not police officers. Failing to knock and announce deprives home owners of the chance to open their doors in order to save their property from destruction and damage and to save themselves from needless shock, embarrassment, and danger.

52. Instead of knocking and announcing their presence, the Defendants immediately battered through the door of the apartment. Had the Defendants bothered to check the handle, they would have learned that the door was unlocked (so did not need to be smashed). Had Defendants bothered to knock and announce their presence, the door could easily have been opened by Michael Pitts's partner, Ms. Abimbola Idris, who had just arrived at the home from work and who was sitting directly next to the door when it was smashed.

53. The Defendants caused permanent damage to the family's door by smashing it. Ms. Pitts has not been able to devote money from her disability payments to repair the door fully.

54. The Defendants knew before their invasion into the home that Patrice Pitts is frail, disabled, and barely able to move because they had already gone to the residence, knocked, and spoken calmly with Ms. Pitts to confirm that Tyrone Pitts had lived there.

55.     When the Defendants burst into the home, they seized and handcuffed Ms. Pitts, who had been lying down, even though she is frail, disabled, and barely able to move.

56.     Ms. Pitts, who can hardly walk across a single room in her apartment even with assistance, was forcibly restrained with metal handcuffs even though she engaged in no remotely threatening or illegal behavior.

57.     No reasonable officer could have believed that physically restraining a disabled Ms. Pitts in metal cuffs was necessary.  After Ms. Pitts was handcuffed, she could not use her cane, and she had to be physically moved to the couch in her living room.

58.     The Defendants kept Ms. Pitts in metal restraints as they searched the home despite her repeated pleas for the painful metal cuffs to be removed.  The Defendants kept Ms. Pitts in metal restraints even though the house was secure, she was calm, and there was no security risk.

59.      The Defendants threatened Ms. Pitts that, if they found out that 64-year-old Tyrone Pitts was in her home, they would call the housing authority on her, and she would be kicked out of her home.  The Defendants made this threat even though they knew that they had already arrested Tyrone Pitts three days earlier and that he was in custody.  The Defendants did not explain to Ms. Pitts, who was now put in fear of being made homeless, any legal basis that they had for making the threat.

60.     Michael Pitts was taken from the kitchen, where he had been cooking dinner, and moved toward the living room with his mother.

61.      One of the Defendant Officers handcuffed him while another Defendant Officer pulled down Mr. Pitts's pants, exposing and then probing his genitals.  The Defendants forced 37-year-old Mr. Pitts to endure this strip search in front of his mother and his partner.

62. The Defendants then forced Mr. Pitts onto the floor, even though at no point was he threatening, violent, or aggressive.

63. The Defendants had no reason to believe that Patrice or Michael Pitts had done anything illegal or threatening.

64. The Defendants had no reason to believe that Michael Pitts was hiding any firearms or firearms-related materials—the only materials that the warrant permitted them to search the home for—in or near his genitals or anal cavity while he was cooking dinner.

65. The Defendants did not have a warrant to search Mr. Pitts, his anal cavity, or his genitalia.

66. Instead, the Defendants repeatedly shouted at Mr. Pitts that they knew that he had drugs in the home and numerous times demanded that he show them where they could find drugs in his apartment. Neither the warrant application nor the warrant issued contained any request or authorization to search for drugs.

67. Michael Pitts's partner, Abimbola Idris, had just arrived home from work when the police invaded the home. She had been working for 7 years at a commercial real estate firm, and she had just removed her shoes and set down her briefcase, which contained a company-owned laptop, when police burst through the door.

68. A male officer asked Ms. Idris if she had any weapons, and she stated that she did not and that she had just come from work. The male officer then frisked her body even though she was wearing a tight dress and clearly was not possessing any weapons.

69. After the officer finished frisking Ms. Idris, finding nothing illegal on her, he handcuffed her. Ms. Idris calmly asked why she was being handcuffed, and the officer told her that everyone in the house "had" to be handcuffed. He then tightened the handcuffs even more,

and the metal cuffs tore into her skin and caused her significant pain. Ms. Idris still has a scar from the tightened handcuffs.

70. Ms. Idris told the officer that she had never been handcuffed before and that the cuffs were hurting her. The officer told her to shut up. She asked the officer three times to loosen the cuffs if he had to keep them on her at all, and the officer told her to shut up repeatedly.

71. An officer then pointed to Ms. Idris's briefcase. She told him to please be careful with it because it contained a laptop belonging to her employer. After Ms. Idris said that to the officer, the officer picked up the briefcase and deliberately dropped the briefcase onto the floor from arm height.

72. Ms. Idris asked the officer what she was supposed to tell her employer if the officer had broken her laptop, and the officer told her to tell her employer that she had been in a "bad neighborhood, in a bad house that she shouldn't have been in."

73. Several Defendants then threatened Michael Pitts again that, if he did not tell them where the drugs were, his partner would go to jail. The Defendants did not identify any crime that Ms. Idris had committed, and Ms. Idris had committed no crime.

74. When the Defendants did not find any drugs or anything else illegal in the home, they began to make fun of Mr. Pitts for cooking dinner.

75. One of the Defendants then put his hands into the food that Mr. Pitts had been preparing, ruining the family's dinner.

76. No reasonable officer could have believed that any firearms or related accessories would be located inside the food that Mr. Pitts had been cooking for his mother and partner.

77. The Defendants then ransacked the home, throwing the family's belongings all around the house. They found nothing illegal in the home.[5]

78. It took the family several days to clean the home

79. The experience traumatized and humiliated Patrice and Michael Pitts. Patrice and Michael Pitts no longer feel safe in their own home.

### Claims for Relief

**One: The Warrant Application Was So Lacking in Probable Cause that No Reasonable Officer Could Have Relied on It in Good Faith. Reliance on the Warrant Application Violated the Fourth Amendment.**

80. The Plaintiffs incorporate by reference the allegations in paragraphs 1-79 above.

81. The Defendants obtaining, planning, and executing the search warrant for the Plaintiffs' home relied on a warrant application that was so plainly lacking in probable cause that no reasonable officer could have relied on it in good faith. The warrant application utterly failed to provide any particularized facts linking the home to any criminal activity, let alone to establish probable cause that the list of specific items sought would be found.

**Two: The Warrant Application Contained Statements that Were Knowingly and Recklessly False and Made Material Omissions in Violation of the Fourth Amendment.**

82. The Plaintiffs incorporate by reference the allegations in paragraphs 1-81 above.

83. The warrant application presented to the Superior Court judge contained numerous statements of "training" and "experience," as well as statements concerning the stop and arrest of Tyrone Pitts, that were knowingly and recklessly false and misleading. The warrant application also omitted material facts known to the MPD officer seeking the warrant that, if presented, would have undermined the asserted basis for seeking the warrant. The Fourth Amendment prohibits

---

[5] Although not authorized by the warrant, the Defendants also stole from the home unidentified mail that the family had received, and they have never given it back.

obtaining a warrant on the basis of knowingly and recklessly false and misleading material assertions as well as the knowing and reckless omission of material information that would undermine a probable cause finding.

**Three:   The Warrant Application Contained Information Obtained in an Unconstitutional Manner in Violation of the Fourth Amendment.**

84. The Plaintiffs incorporate by reference the allegations in paragraphs 83 above.

85. The warrant application relied on material information derived from the nonconsensual and unconstitutional search of Tyrone Pitts.  That information was improperly included in the warrant application in violation of the Fourth Amendment.

**Four:  The Obvious Lack of Probable Cause and False and Reckless Statements and Omissions Were the Result of a Policy, Pattern, and Custom of Such Conduct by the MPD and the Result of the MPD's Failure to Properly Train and Supervise Its Officers.**

86. The Plaintiffs incorporate by reference the allegations in paragraphs 1-85 above.

87. The MPD has established a pattern, policy, and practice of training its officers to include in search warrant applications statements of "training" and "experience" that are unsubstantiated, vague, self-defeating, contradictory, woefully insufficient to substitute for actual evidence, and materially false and recklessly misleading in the ways described in this Complaint. The MPD has established a pattern, policy, and practice of training its officers to use such statements of "training" and "experience" about the habits of "gun possessors" that officers stop on the street as a purported substitute for any actual evidence or police investigation into any evidentiary link to a particular residence.  Despite having knowledge of the fatal factual and legal flaws in these statements, the MPD continues to instruct its officers to predicate search warrant raids on such "training" and "experience"-based statements.  The MPD has failed to properly train and to properly supervise its officers on the Fourth Amendment standards for obtaining highly intrusive home search warrants.

**Five: Officers Raiding the Home Failed to Knock and Announce Their Presence Before Breaking the Door and Raiding the Home**

88. The Plaintiffs incorporate by reference the allegations in paragraphs 1-87 above.

89. The MPD officers executing the warrant failed to knock and announce their presence prior to smashing the Plaintiffs' door and bursting into the apartment, even though there were no exigent circumstances to justify the failure to knock and announce.

**Six: Negligence Per Se: Officers Were Negligent When They Failed to Knock and Announce Their Presence Despite a Constitutional and Statutory Duty to Do So.**

90. The Plaintiffs incorporate by reference the allegations in paragraphs 1-89 above.

91. Both the Constitution and District of Columbia law require officers to knock and announce their presence and to wait a reasonable period of time before bursting into a family's home absent special circumstances justifying a no-knock entry. By executing the home raid and search under the circumstances and in the manner described, Defendant Officers negligently exposed the Plaintiffs to the risks that the law is designed to prevent, caused permanent damage to their door, and needlessly humiliated and frightened the family.

**Seven: Officers Raiding the Home Exceeded the Scope of the Warrant, Used Excessive Force, Made Unnecessary and Unreasonable Seizures Not Authorized By the Warrant, and Engaged in Conduct that Shocks the Conscience in Violation of the Fourth and Fifth Amendments.**

92. The Plaintiffs incorporate by reference the allegations in paragraphs 1-91 above.

93. The MPD officers raiding the home unlawfully searched the home and its occupants—including a humiliating and unjustified strip search of Mr. Pitts's genitals and anal cavity and a search of the hot food that he had just prepared for the family—for drugs even though the warrant explicitly authorized only a search for firearms and related accessories. These unlawful drug searches, as well as the repeated interrogations of the occupants of the home concerning drug crimes unjustifiably prolonged the home raid. The MPD officers also used

unnecessary and excessive force in removing the disabled Ms. Pitts from her bed and handcuffing her for the duration of the home search even though she posed no threat and even though the metal handcuffs made her unable to move because she could not use her cane.  The officers similarly handcuffed Mr. Pitts and Ms. Idris and kept them in handcuffs even though they were calm, non-threatening, not linked to any illegal or dangerous activity, and visibly in pain.  The officers also verbally taunted and threatened Patrice and Michael Pitts, including telling them that they were drug criminals, that officers knew there were drugs in their home, that officers would jail their loved ones, and that officers would render them homeless.  The unlawful, painful, and unjustified seizures, taunts, and threats made to innocent and vulnerable people in their own home shock the conscience and violate the Fourth and Fifth Amendments.

## Request for Relief

WHEREFORE, Plaintiffs request that this Court issue a judgment against the Defendants:

a. Holding the appropriate Defendants liable to the Plaintiffs for compensatory damages in an amount appropriate to the proof adduced at trial;
b. Holding the appropriate Defendants (other than the District of Columbia) liable to the plaintiffs for punitive damages in an amount appropriate to the proof adduced at trial;
c. Awarding to plaintiffs their costs and reasonable attorneys' fees; and
d. Granting such other and further relief as the Court deems just and proper.

Respectfully submitted,

__/s/ Alec Karakatsanis_____
Alec Karakatsanis (D.C. Bar No. 999294)
Phil Telfeyan (D.C. Bar Application Pending)

Equal Justice Under Law
916 G Street, NW Suite 701
Washington, D.C. 20001
(202) 681-2409
*Attorneys for Plaintiffs*        Date: May 24, 2015