# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| PATRICE PITTS, *et al.*, | ) | |
| Plaintiffs, | )<br>)<br>) | |
| v. | )<br>) | Civil Action No. 14-cv-1319 (TSC) |
| DISTRICT OF COLUMBIA, *et al.*, | )<br>) | |
| Defendants. | )<br>)<br>) | |

## MEMORANDUM OPINION

In this civil rights action under 42 U.S.C. § 1983, Patrice Pitts and her son Michael Pitts

challenge the Metropolitan Police Department's practice of obtaining home search warrants

based on nothing more than street arrests for gun possession and an officer's purported "training

and experience" regarding the habits and tendencies of gun possessors.  Plaintiffs allege that

twelve named MPD officers and an unspecified number of "John Doe" MPD officers

(collectively, the "MPD Officer Defendants") violated Plaintiffs' constitutional rights when they

broke down their front door, ransacked their home, and subjected them to humiliating and

invasive searches, including a rectal cavity search of Michael Pitts conducted in full view of his

mother and partner.  Specifically, Plaintiffs allege that

    i.    the MPD Officer Defendant who swore out an affidavit in support of the
warrant to search their home violated the Fourth Amendment by obtaining the
warrant based on (a) knowingly and recklessly false statements and material
omissions (Count II), and (b) information that was itself obtained in violation
of the Fourth Amendment (Count III);

    ii.    the MPD Officer Defendants violated the Fourth Amendment in relying on the
search warrant because it was so facially lacking in probable cause that no
reasonable officer could have relied on it in good faith (Count I);

iii.   the MPD Officer Defendants violated the Fourth Amendment in executing the search warrant by

    a.   failing to knock and announce prior to entering their apartment (Counts V and VI),

    b.   strip searching Michael Pitts, which entailed exposing and probing his genitals and anal cavity in front of both his mother and his partner (Count VII),

    c.   conducting an extended search for drugs despite the fact that the warrant pertained only to firearms and related items (Count VII), and

    d.   unjustifiably handcuffing them for the entire duration of the search (Count VII); and

iv.   the MPD Officer Defendants violated the Fifth Amendment in executing the search warrant by engaging in conduct that shocks the conscience (Count VII).

Plaintiffs also bring a *Monell* claim for municipal liability against the District of Columbia, asserting that the Fourth Amendment violation described in paragraph (i)(a) above was the result of a policy, pattern and custom of such conduct by the MPD, as well as the MPD's failure to properly train and supervise its officers (Count IV).

Defendants move to dismiss Plaintiffs' Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  They argue that the MPD Officer Defendants are entitled to qualified immunity because Plaintiffs have not sufficiently alleged a violation of their clearly established constitutional rights.  They also argue that Plaintiffs cannot make out a *Monell* violation because they cannot point to any predicate constitutional violation.

Upon consideration of Defendants' Motion and the parties' respective submissions, and for the reasons set forth below, Defendants' Motion is hereby **GRANTED IN PART and DENIED IN PART.**

I.      **FACTUAL BACKGROUND**

Plaintiffs, 56-year-old Patrice Pitts and her 37-year-old son Michael Pitts,[1] allege that on the evening of March 26, 2013, the heavily armed MPD Officer Defendants broke down the front door of their Southeast Washington, D.C. apartment without knocking and announcing their presence while executing a search warrant.  The warrant application was based on the affidavit of MPD Officer Defendant Mark Pugh (the "Affidavit").  The events leading up to and including the execution of the search warrant are set forth below.

a.   Tyrone Pitts Is Arrested On The Sidewalk In Front Of Plaintiffs' Apartment Building

According to Pugh's Affidavit, on March 23, 2013 (three days before the search was executed), Pugh and two other officers were conducting a "Robbery Suppression Operation in PSAs 704, 705 and 708," which the Affidavit describes as being "known for having large amounts of street robberies involving firearms."  (Am. Compl. Ex. 1 ("Warrant") at 3).  The Affidavit states that one officer had received information that an individual who frequented the front of Plaintiffs' apartment building at 3921 4th Street S.E. was armed with a handgun.  (*Id.*).  The Affidavit further states that, during the operation, the officers noticed Tyrone Pitts,[2] who is Patrice's uncle, and who was then 64 years old, standing on the sidewalk in front of the apartment building wearing dark clothing.  (*Id.*).

According to the Affidavit, when Tyrone noticed the officers' presence, he attempted to avoid eye contact and appeared unsure of where he wanted to go.  (*Id.*).  The officers then "made contact" with Tyrone and asked him "if he had anything illegal on his person.  [He] replied 'No, you can check,'" and raised both of his arms in the air.  (*Id.*).  Pugh then conducted a protective

---

[1] In order to avoid confusion, Plaintiffs will hereinafter be referred to by their first names.

[2] As with Patrice and Michael Pitts, Tyrone Pitts (who is not a plaintiff in this case) will hereinafter be referred to by his first name.

pat-down for weapons and felt a metal object in the front of Tyrone's waistband, which turned

out to be a nine-millimeter semi-automatic handgun loaded with eleven rounds of ammunition.

(*Id.*).  Tyrone was then arrested for possessing the handgun.  (*Id.* at 4).  Record searches

subsequently determined that he was not licensed to carry a pistol in the District of Columbia and

had not registered any firearms or ammunition in the District.  (*Id.*).

Plaintiffs challenge certain of the Affidavit's assertions regarding Tyrone's arrest.  Most

notably, they allege that Tyrone did not spontaneously declare to the officers that they could

search him for weapons, and that, "[i]n reality, [he] was forcibly stopped on the street by MPD

officers and immediately frisked and searched without ever providing consent."  (Am. Compl.

¶¶ 43-44).

b.  The MPD Conducts Reconnaissance Of The Apartment Before Seeking The Warrant

According to the Affidavit, after his arrest, Tyrone informed MPD officers that he lived

in apartment number two at 3921 4th Street S.E.  (Warrant at 4).  Later that day, a uniformed

MPD officer visited the apartment.  (*Id.*).  The officer was met at the door by Patrice, who –

apparently unaware that her uncle was already in custody – stated that she was Tyrone's niece,

and that Tyrone lived there, but was not home.  (*Id.*).

Plaintiffs allege that, based on this interaction between the MPD officer and Patrice, the

MPD Officer Defendants "knew before their invasion into the home that [Patrice] is frail,

disabled and barely able to move."  (Am. Compl. ¶ 54).

c.  Officer Pugh Applies For The Search Warrant

After Tyrone's arrest and the MPD's reconnaissance of the apartment where the Pitts

family lived, Officer Pugh applied for a warrant to search (i) "the entire premise" of the

apartment "for the seizure of additional guns, additional ammunition and other gun related items,

photographs or paperwork that reflect the possession of firearms, or paperwork reflecting who

inhabits the residence," as well as (ii) "any occupants located within the premises."  (Warrant at 4).

As Plaintiffs note, Pugh's Affidavit did not cite any particularized facts about Plaintiffs' apartment that would tend to indicate that the police were likely to find guns or gun-related items there; instead, the only evidence connecting the apartment to any criminal activity was the fact that a person who lived there (Tyrone) had been arrested three days earlier for possessing a gun on the street outside the apartment.  (Am. Compl. ¶¶ 16, 22).  Accordingly, Pugh's warrant application was based on the foregoing recitation of the circumstances surrounding Tyrone's arrest and the MPD's reconnaissance of the apartment, as well as Pugh's (i) training from the MPD "Institute of Police Science" in the illegal possession of firearms; (ii) experience "as an officer enforcing laws against the illegal possession of firearms" and "affecting arrests of individuals illegally possessing firearms"; and (iii) "work with other veteran police officers, investigators and detectives," all of which purportedly led Pugh to "reasonably believe[]" the following:

- "That persons who keep or carry guns illegally commonly retain items associated with their firearms long after they bought or obtained the guns, . . . and, that these are almost always stored in the gun-possessor's home"[3];

- That gun possessors "keep in storage extra ammunition for their firearms, beyond the immediate capacity of the particular firearm and, that they keep such additional ammunition in their homes"[4];

---

[3] Pugh noted that gun cleaning equipment, in particular, "normally is not carried on a person with a gun, but kept at home to be used periodically to keep a gun 'in shape' or good working order." (Warrant at 2).

[4] Pugh also averred "that the smallest amount [of ammunition] that commonly can be bought from a gun shop is a 50-round box" and that, because "few if any guns have a capacity of 50 rounds, . . . most persons who have guns in [the District] must have bullets kept or stored outside a gun that is being carried personally."  (Warrant at 2).  Notably, Plaintiffs allege, that a different MPD officer had, just weeks earlier, cited "the same MPD 'training' and 'experience'" in averring under oath that, "because one cannot legally purchase bullets in the

- That "it is not uncommon for a person who is found to be carrying a firearm in his possession to have stored at his home one or more additional firearms, along with additional ammunition, and papers related to the acquisition of that firearm";

- "That many persons who illegally possess guns often have pictures taken of themselves with friends in which they display their gun or guns," and that such pictures are "commonly" kept at the gun possessor's home, including on cell phones and personal computers;

- "That, even after an individual's arrest for gun-related charges, the person's family commonly do[es] not dispose of other firearms or ammunition; and, even if they do get rid of other guns, they are much less likely to get rid of ammunition"; and

- That, even after an individual's arrest for gun-related charges, "hardly ever do [the arrestee's] associates remove or get rid of gun packaging or cleaning equipment or photos of a person with a gun, and that such items will remain at the arrested individual's home for a considerable period of time after such arrest."

(Warrant at 2-3).

Plaintiffs allege that "Pugh's claim that police were likely to find the firearms-related items because of the habits of [gun possessors like Tyrone] was knowingly and recklessly false," and that, "based on publicly available records, it was far more likely than not that the Defendants would *not* find each of the items sought."  (Am. Compl. ¶ 29).  According to Plaintiffs, MPD search warrant inventory returns show that in the one-year period surrounding and including the execution of the search warrant here, home searches for guns and gun paraphernalia based on warrant applications that lacked particularized facts and referred only to street arrests for gun possession and MPD officers' claimed "training and experience" failed to turn up evidence of gun ownership in the overwhelming majority of cases.  (*Id.* ¶¶ 4b, 29-30).  Specifically, Plaintiffs allege that such searches failed to find ammunition 74% of the time, failed to find guns 91% of

---

District, 'there are often places where you can buy loose bullets or individual bullets from other gun possessors.'"  (Am. Compl. ¶ 18 & n.2) (quoting 2013 CRW 000105).

the time and failed to find documentary or photographic evidence of gun possession at least 94% of the time.  (*Id.*).

Plaintiffs also allege that Pugh "misled the issuing judge" in applying for the search warrant by failing to inform the judge that (i) many guns in the District "are passed and traded by individuals without documentation or records, and without the person possessing any receipts or accoutrements of legal gun ownership"; (ii) gun possessors in the District "frequently share guns with multiple other residents [of the District] and therefore often possess firearms on the street that they do not actually own"; and (iii) the MPD "trains its officers that gun possessors commonly possess [guns and gun-related items] in a variety of other places that are ***not*** their homes."  (*Id.* ¶¶ 31-34).[5]

### d.  The Search Warrant Is Issued

On the basis of the Affidavit, a D.C. Superior Court judge issued a search warrant on March 26, 2013.  (Warrant at 1).  Despite the fact that Officer Pugh requested a warrant authorizing a search of ***both*** "the entire premise" of the apartment ***and*** "any occupants located within the premises," the warrant provided for a search of ***the premises only***.  (*Id.* at 1, 4).  The warrant stated that it was based on probable cause to believe that the apartment contained "illegal firearms, parts of firearms, firearm magazines, ammunition, holsters, gun cleaning kits, gun cases, pictures, papers or other paraphernalia relating to the ownership of a firearm," and authorized the seizure of such property.  (*Id.* at 1).

---

[5] On this latter point, Plaintiffs cite a number of "training and experience"-based search warrant applications in which MPD officers have averred that "illegal gun possessors in the District commonly stash their firearms and accessories in safe places that are ***not*** their homes."  (Am. Compl. ¶ 34) (emphasis in original).

e.  <u>The MPD Officer Defendants Execute The Search Warrant</u>

Plaintiffs allege that on the evening of March 26, 2013, the heavily armed MPD Officer Defendants broke down the front door of their apartment to execute the search warrant without first knocking to announce their presence, despite the absent of any exigent circumstances that could have justified their failure to knock and announce, and despite the fact that the door was unlocked.  They also allege that the door was permanently damaged by the officers' forcible entry.  (Am. Compl. ¶¶ 1, 46-53).

Several officers seized and handcuffed Patrice, who had been lying in bed, "even though she is frail, disabled, and barely able to move," and even though she engaged in no threatening or illegal behavior.  (*Id.* ¶¶ 55, 93).  "[D]espite her repeated pleas for the painful metal cuffs to be removed" and the fact that "the house was secure, she was calm, and there was no security risk," the officers then brought Patrice to the living room and kept her in handcuffs as they searched the apartment.  (*Id.* ¶ 58).  Additionally, despite knowing that Tyrone was already in custody, the officers told Patrice that they would contact the housing authority and get her evicted if they found out that Tyrone was in the apartment.  (*Id.* ¶ 59).

Meanwhile, Michael was taken from the kitchen, where he had been cooking dinner, and brought to the living room, where his mother was handcuffed.  (*Id.* ¶ 60).  One officer handcuffed him while another pulled down his pants and exposed and probed his genitals and anal cavity in front of his mother and his partner, Abimbola Idris.[6]  (*Id.* ¶¶ 1, 24, 61, 64-65, 93). Michael was then forced to the floor.  (*Id.* ¶ 62).  Despite the fact that the warrant did not authorize a search for drugs, the officers "repeatedly shouted at [Michael] that they knew that he had drugs in the home and numerous times demanded that he show them where they could find

---

[6] Idris is not a plaintiff in this case.

drugs." (*Id.* ¶ 66). They also told Michael that "if he did not tell them where the drugs were, his partner would go to jail." (*Id.* ¶ 73). The officers also made fun of Michael for cooking dinner, and one officer "put his hands into the food that [Michael] had been preparing, ruining the family's dinner." (*Id.* ¶ 75).

Idris had just arrived home from work moments before police burst through the door. (*Id.* ¶ 67). A male officer asked her if she had any weapons, and she stated that she did not, and that she had just come home from work. (*Id.* ¶ 68). The officer then patted her down, despite the fact that she was wearing a tight dress and was clearly unarmed. (*Id.*). She was then handcuffed. (*Id.* ¶ 69). When she calmly asked why she had been handcuffed, an officer told her that everyone in the house "had" to be handcuffed before then tightening the handcuffs so that they cut into her skin, causing her significant pain and leaving a scar. (*Id.*). When Idris complained that the handcuffs were hurting her, she was told to shut up. (*Id.* ¶ 70). When an officer pointed to her briefcase, Idris asked him to be careful with it because it contained a laptop belonging to her employer. (*Id.* ¶ 71). The officer then "picked up the briefcase and deliberately dropped [it] onto the floor from arm height." (*Id.*). Idris "asked the officer what she was supposed to tell her employer if the officer had broken her laptop, and the officer told her to tell her employer that she had been in a 'bad neighborhood, in a bad house that she shouldn't have been in.'" (*Id.* ¶ 72).

The officers "then ransacked the home, throwing the family's belongings all around the house." (*Id.* ¶ 77). They did not find any guns or any of the gun-related items described in the search warrant, nor did they find any drugs or other contraband. (*Id.* ¶ 77). The officers seized only some of the family's mail, which was never returned to them. (*Id.* at 17 n.5; Warrant at 1). It took the Pitts family several days to clean their apartment, and the experience left them traumatized, and feeling unsafe in their own home. (*Id.* ¶ 79).

f.  Plaintiffs' Allegations Regarding The MPD's Pattern, Policy And Practice
Of Obtaining Warrants For Home Searches Based On Gun Arrests Outside
The Home And Averments Regarding Officer "Training And Experience"

Plaintiffs allege that the MPD "has adopted a pattern, policy, and practice of instructing

its officers to obtain and execute search warrants [for] the alleged residences of people on whom

they find firearms during traffic and street stops . . . despite the obvious lack of any evidentiary

connection to the residence," and despite case law from this Circuit holding that "home raids

based solely on possession of a firearm somewhere away from the home clearly lack probable

cause." (Am. Compl. ¶ 39).  Plaintiffs further allege that the MPD trains its officers to use

barebones affidavits based on "training and experience," as well as "false and misleading

statements about the habits of a generic category of people that it labels 'gun possessors,' . . . to

turn any gun arrest anywhere in the District into an automatic home raid, even though officers

know that they are unlikely to find the evidence that they claim to seek" in such raids.

(*Id.* ¶¶ 37-38).

Plaintiffs claim that in the one-year period surrounding the execution of the search

warrant at issue in this case, MPD officers obtained warrants for at least 56 home searches on the

basis of having found a firearm on a resident of the home during a street stop and their purported

"training and experience" regarding the habits and tendencies of gun possessors, but without

presenting any other evidence linking the home to any criminal activity.  (*Id.* ¶ 40).  As noted

above, Plaintiffs allege that, in the vast majority of instances, these searches found no evidence

of gun possession.  (*Id.* ¶¶ 4b, 29-30).

## II.  LEGAL STANDARD

### a.  Motion To Dismiss Under Rule 12(b)(6)

"A Rule 12(b)(6) motion tests the legal sufficiency of a complaint." *Browning v. Clinton*,

292 F.3d 235, 242 (D.C. Cir. 2002).  In considering a motion to dismiss for failure to state a

claim under Rule 12(b)(6), a court must construe the complaint in the light most favorable to the plaintiffs, *see id.*, and "must assume the truth of all well-pleaded allegations." *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal and citation omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citation omitted). Although a plaintiff may survive a Rule 12(b)(6) motion even where "recovery is very remote and unlikely," the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 56 (2007) (quotation and citation omitted). Moreover, a pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

   b.   Qualified Immunity

   "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). This protection is afforded to government officials regardless of whether their "error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.* (quotation and citations omitted); *see also Brinegar v. United States*, 338 U.S. 160, 176 (1949) ("Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability."); *Anderson v. Creighton*, 483 U.S. 635, 661 (1987) (Stevens, J., dissenting) ("The concept of probable cause leaves room for mistakes, provided

always that they are mistakes that could have been made by a reasonable officer.").  In short,

"all but the plainly incompetent or those who knowingly violate the law" enjoy the protection of

qualified immunity.  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

"[W]hether an official protected by qualified immunity may be held personally liable for

an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of

the action, assessed in light of the legal rules that were 'clearly established' at the time it was

taken."  *Anderson*, 483 U.S. at 639 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982)).

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether

it would be clear to a reasonable officer that his conduct was unlawful in the situation he

confronted."  *Saucier v. Katz*, 533 U.S. 194, 202 (2001).  "Ordinarily, in order for the law to be

clearly established, there must be a Supreme Court or Circuit decision on point, or the clearly

established weight of authority from other courts must have found the law to be as the plaintiff

maintains."  *Doe v. District of Columbia*, 796 F.3d 96, 104 (D.C. Cir. 2015) (citation and

brackets omitted); *see also Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (noting that courts "do

not require a case directly on point, but existing precedent must have placed the statutory or

constitutional question beyond debate").

Given the nature of the qualified immunity calculus, "if the facts in the record could at

least arguably give rise to probable cause," then a defendant is "entitled to qualified immunity."

*Wesby v. District of Columbia*, No. 12-7127, 2016 WL 482910, at *5 (D.C. Cir. Feb. 8, 2016)

(citing *Hunter v. Bryant*, 502 U.S. 224, 227 (1991); *Wardlaw v. Pickett*, 1 F.3d 1297, 1304 (D.C.

Cir. 1993)).  Importantly, it is Plaintiffs' "burden to show that the particular right in question –

narrowly described to fit the factual pattern confronting the officers – was clearly established."

*Dukore v. District of Columbia*, 799 F.3d 1137, 1145 (D.C. Cir. 2015) (citing *Reichle v.

Howards*, 132 S. Ct. 2088, 2094 (2012)).

### III.    ANALYSIS

Defendants move to dismiss on a number of grounds, including that (i) the MPD Officer Defendants are entitled to qualified immunity; (ii) Plaintiffs fail to allege a *Monell* violation against the District; and (iii) the MPD Officer Defendants were not negligent *per se* in failing to knock and announce before entering Plaintiffs' apartment to execute the search warrant.  The court will address each count of the Amended Complaint in turn, having reordered them to reflect the chronology of relevant events.

### a.   The Issuance Of The Warrant Based On Allegedly False Information (Count II)[7]

Count II of the Amended Complaint alleges that Pugh's Affidavit "contained numerous statements of 'training' and 'experience' . . . that were knowingly and recklessly false and misleading" and "omitted material facts known to [him] that, if presented, would have undermined the asserted basis for seeking the warrant."  (Am. Compl. ¶ 83).[8]  Plaintiffs allege that these false and misleading statements and omissions violated their Fourth Amendment rights.

The Supreme Court has explained that an expectation of truthfulness attends all warrant applications:

> When the Fourth Amendment demands a factual showing sufficient to comprise "probable cause," the obvious assumption is that there will be a ***truthful*** showing. This does not mean "truthful" in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily.  But surely

---

[7] Plaintiffs make clear in their supplemental brief that Count II is asserted only against MPD Officer Defendant Pugh.  (Pls.' Supplemental Br. at 10).

[8] While Count II also references Pugh's allegedly false statements concerning the street search of Tyrone, those allegations will be addressed separately below, in the court's discussion of Count III, which more directly concerns the Affidavit's representations regarding the circumstances of that initial street search.

it is to be "truthful" in the sense that the information put forth is believed or appropriately accepted by the affiant as true.

*Franks v. Delaware*, 438 U.S. 154, 164-65 (1978) (quotation and citations omitted) (emphasis in original).  Given this expectation, the Fourth Amendment is violated where "a false statement knowingly and intentionally, or with reckless disregard for the truth, [is] included by the affiant in the warrant affidavit . . . if the allegedly false statement is necessary to the finding of probable cause."  *Id.* at 155-56.

Here, Pugh's Affidavit stated that his "training and experience" led him to reasonably believe that evidence of Tyrone's gun possession would be found inside the apartment.  (Warrant at 2-4).  Plaintiffs allege, however, that the overwhelming majority of MPD home searches based on nothing more than street arrests for gun possession and statements regarding an affiant officer's "training and experience" ***do not*** actually uncover any evidence of gun possession. (Am. Compl. ¶¶ 29-31).  According to Plaintiffs, MPD records reveal that in the one-year period surrounding and including the execution of the search warrant at issue in this case, "training and experience"-based home searches following street arrests for gun possession failed to find ammunition 74% of the time, failed to find guns 91% of the time and failed to find documentary or photographic evidence of gun possession at least 94% of the time.  (*Id.* ¶ 30).

Based on these statistics, Plaintiffs assert that Pugh was untruthful in his Affidavit because his training and experience could not have led him to reasonably believe that evidence of gun possession would be found in the apartment, and instead led him to believe that such evidence would **not** be found there.  (*Id.* ¶¶ 29-31).  Notably, the Amended Complaint does not allege that Pugh was aware of the aforementioned MPD statistics, or that his personal experience mirrored those statistics.  It does state, however, that Pugh's "claim that police were likely to find the firearms-related items because of the habits of such criminals was knowingly and

recklessly false." (Am. Compl. ¶ 29).  Additionally, after discussing the failure rate of the

MPD's "training and experience"-based searches, the Amended Complaint refers to other

information allegedly omitted from the Affidavit as "other material facts in [Pugh's] possession,"

which could be read to mean that Pugh also knew about the aforementioned failure rate.

(*Id.* ¶ 32).  Given that the court must read Plaintiffs' allegations in the light most favorable to

them, it will construe the Amended Complaint as alleging that Pugh knew, based on his actual

"training and experience," that "it was far more likely than not that the Defendants would ***not***

find" evidence of gun ownership in the apartment.  (*Id.* ¶ 31) (emphasis in original).

Defendants argue that "Plaintiffs' post hoc review of statistical data attempts to quantify

probable cause, a practice which the Supreme Court has expressly condemned" (Mot. at 11)

(citation omitted), and that "[s]tatistics based on search success rates have relatively limited

import to probable cause because errors may abound in the records."  (Reply at 4).  But

Defendants misunderstand the import of Plaintiffs' argument.  As noted above, the court

construes Plaintiffs as alleging that Pugh's actual "training and experience" is contrary to the

"training and experience" to which he averred in the Affidavit.  If Plaintiffs are correct – and the

court must assume at this stage of the proceedings that they are – then the Affidavit's statements

regarding Pugh's "training and experience" were false, or at least misleading.  In such a

circumstance, the court must determine whether "the allegedly false statement[s were] necessary

to the finding of probable cause."  *Franks*, 438 U.S. at 155-56.  In order to do so, the court must

excise the allegedly false and misleading statements from the Affidavit and determine *de novo*

whether the "hypothetical, redacted affidavit still established probable cause."  *United States v.*

*Cardoza*, 713 F.3d 656, 659 (D.C. Cir. 2013)

In this case, when Pugh's averments regarding his "training and experience" are removed

from the Affidavit, all that remains are his averments regarding (i) the circumstances of the

initial street stop, search and arrest of Tyrone; (ii) the MPD's reconnaissance of the apartment; and (iii) the MPD's search of its records to determine that Tyrone was not licensed to carry a firearm and had not registered any guns or ammunition.  These allegations, taken alone, do not make out probable cause to search the apartment because they fail to meet the so-called "nexus requirement," which requires that there be "reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought."  *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978); *see also United States v. Lalor*, 996 F.2d 1578, 1583 (4th Cir. 1993) ("residential searches have been upheld only where some information links the criminal activity to the defendant's residence").

The court's finding is further supported by Plaintiffs' allegations that Pugh failed to inform the issuing judge of certain facts "in his possession" that would tend to indicate that evidence of gun possession would ***not*** be found in a gun possessor's home.  (Am. Compl. ¶ 32). For example, Plaintiffs allege that Pugh failed to inform the issuing judge that: (i) many guns in the District "are passed and traded by individuals without documentation or records, and without the person possessing any receipts or accoutrements of legal gun ownership"; (ii) gun possessors in the District "frequently share guns with multiple other residents [of the District] and therefore often possess firearms on the street that they do not actually own"; and (iii) the MPD "trains its officers that gun possessors commonly possess [guns and gun paraphernalia] in a variety of other places that are ***not*** their homes."  (*Id.* ¶¶ 31-34) (emphasis in original).  The court finds that adding these allegedly omitted facts to a version of the Affidavit that has been stripped of the allegedly false and misleading statements regarding Pugh's "training and experience" would only further vitiate probable cause.

In light of the foregoing, the court concludes that Plaintiffs have sufficiently stated a claim that Officer Pugh secured the warrant to search their home with material false statements

or omissions, thereby violating the Fourth Amendment.  The court will therefore deny

Defendants' Motion as to Count II, save for those portions of the count concerning the street

search of Tyrone, which are addressed separately below.

>    b.  The *Monell* Claim For Municipal Liability (Count IV)

Count IV seeks to hold the District liable for its alleged "pattern, policy, and practice of

training its officers to include in search warrant applications statements of 'training' and

'experience' that are unsubstantiated, vague, self-defeating, contradictory, woefully insufficient

to substitute for actual evidence, and materially false and recklessly misleading," including

"statements of 'training' and 'experience' about the habits of 'gun possessors' that officers stop

on the street as a purported substitute for any actual evidence or police investigation into any

evidentiary link to a particular residence."  (Am. Compl. ¶ 87).  Plaintiffs further allege that "the

MPD continues to instruct its officers to predicate search warrant raids on such 'training' and

'experience'-based statements . . . [d]espite having knowledge of the fatal factual and legal flaws

in these statements" (*id.*), and that it has done so at least 56 times "[i]n the one-year period

surrounding the execution of the warrant in this case" (*id.* ¶ 40).  Put differently, Plaintiffs allege

that the conduct challenged in Count II is part of a pattern, policy or practice that is prevalent

throughout the MPD.

"[I]n considering whether a plaintiff has stated a claim for municipal liability, the district

court must conduct a two-step inquiry.  First, the court must determine whether the complaint

states a claim for a predicate constitutional violation.  Second . . . the court must determine

whether the complaint states a claim that a custom or policy of the municipality caused the

violation."  *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003) (citing *Collins

v. City of Harked Heights*, 503 U.S. 115, 120 (1992)).  Defendants' only argument against

municipal liability is that Plaintiffs cannot establish the requisite predicate constitutional

violation.  The court has already held, however, that Plaintiffs' allegations are sufficient to make out a claim against Pugh regarding the manner in which he secured the search warrant.  Because Count IV frames the conduct at issue in Count II as part of a pattern, policy or practice of the MPD, Count II's survival ensures that Count IV will survive, as well.  The court will therefore deny Defendants' Motion as to Count IV.

     c.   The Issuance Of The Warrant Based On Information Derived From
         The Allegedly Illegal Street Search Of Tyrone Pitts (Counts II and III)[9]

In Count III, Plaintiffs allege that the Affidavit "relied on material information derived from the nonconsensual and unconstitutional search of Tyrone," and that this information "was improperly included in the warrant application in violation of the Fourth Amendment."  (Am. Compl. ¶ 85).  Specifically, while the Affidavit describes this initial street search as a consensual search (Warrant at 3), Plaintiffs allege that Tyrone never consented, and that the street search therefore violated the Fourth Amendment, meaning that the evidence obtained as a result of the search was obtained illegally.  (Am. Compl. ¶¶ 44-45, 85).  Plaintiffs contend that the Affidavit's reference to this illegally obtained evidence constituted a Fourth Amendment violation because illegally obtained evidence cannot form the basis of a warrant.

Defendants argue that Plaintiffs lack standing to challenge the street search of Tyrone. They note that evidence obtained in derogation of the Fourth Amendment is regularly admitted against a search subject's co-conspirators and co-defendants who have no personal right of privacy in the places searched or the evidence seized.  Plaintiffs contend that they are not asserting Tyrone's rights, but are instead challenging the search of their home on the basis of a warrant that would not have issued if not for the illegal street search of Tyrone:

---

[9] As noted above, Count II references to Pugh's allegedly false averments regarding the street search of Tyrone.

> When officers deliberately mislead an issuing judge to obtain a warrant that they
> would not have been able to obtain under binding precedent, and a plaintiff is
> injured by that conduct through the search of the plaintiff's own home, a plaintiff
> has standing to challenge the validity of the warrant.

(Sur-Reply at 6-7).

The Supreme Court has made clear time and again, however, that Fourth Amendment

rights "are personal rights which may not be vicariously asserted." *Plumhoff v. Rickard*, 134 S.

Ct. 2012, 2022 (2014) (quotation, citation and alteration omitted).  Because "the Fourth

Amendment protects people, not places," *Katz v. United States*, 389 U.S. 347, 351 (1967), an

individual has standing to bring a Fourth Amendment challenge only where his or her own

constitutional rights have been violated.  *See*, *e.g.*, *United States v. Salvucci*, 448 U.S. 83, 86-87

(1980) (holding that "it is entirely proper to require of one who seeks to challenge the legality of

a search" that he establish "that he himself was the victim of an invasion of privacy," and noting

that "attempts to vicariously assert violations of the Fourth Amendment rights of others have

been repeatedly rejected by" the Supreme Court) (quotations and citations omitted).  Thus, when

an individual challenges the validity of a search or the introduction of evidence seized during a

search, that individual must have a "legitimate expectation of privacy" in the place searched or

the items seized.  *Rakas v. Illinois*, 439 U.S. 128, 143 (1978).

While Plaintiffs assert a violation of their Fourth Amendment rights with regard to the

issuance of the search warrant based on illegally obtained information, that assertion is entirely

dependent on a finding that the street search of Tyrone was, in fact, unconstitutional, such that

the fruits of that search can be considered "illegally obtained."  To be sure, Plaintiffs explicitly

allege that the street search was unlawful and unconstitutional, but these allegations amount to

legal conclusions, and "the tenet that a court must accept as true all of the allegations contained

in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678; *see also Browning*,

292 F.3d at 242 (noting that, while a court must accept a plaintiff's factual allegations as true under Rule 12(b)(6), it need not accept "legal conclusions cast in the form of factual allegations") (quotation and citation omitted).  And while the court must accept as true Plaintiffs' *factual* allegation that Tyrone did not consent to be searched, determining whether the alleged absence of consent rendered the search illegal would require the court to make a determination as to whether *Tyrone's* Fourth Amendment rights were violated by the search.  Plaintiffs simply do not have standing to ask the court to make such a determination, as they had no "legitimate expectation of privacy" with regard to Tyrone's person or the gun found on his person at the time he was searched.  *Rakas*, 439 U.S. at 143.  If the court cannot determine that the search of Tyrone was unlawful, then it cannot find that Plaintiffs' Fourth Amendment rights were violated by the Affidavit's reference to the fruits of that search.  Accordingly, because Plaintiffs lack standing to assert that the Affidavit relied on evidence obtained through the violation of Tyrone's Fourth Amendment rights, the court will grant Defendants' Motion as to Count III.

The court now turns to the portion of Count II that references Officer Pugh's allegedly false factual statements concerning the search that led to the discovery of the gun in Tyrone's waistband and his subsequent arrest.  (Am. Compl. ¶ 83).  As noted above, the court is not required to accept as true Plaintiffs' allegations regarding the legality of that search, and Plaintiffs lack standing to actually challenge its legality.  The court must, however, accept as true Plaintiffs' purely factual allegation that Tyrone did not consent to the search (*id.* ¶ 44), which requires it to read Pugh's reference to Tyrone's consent out of the Affidavit and determine whether the "hypothetical, redacted affidavit still established probable cause."  *Cardoza*, 713 F.3d at 659.  But given Plaintiffs' lack of standing to challenge the legality of the search and their admission that a gun was, in fact, found in Tyrone's waistband, merely removing reference to Tyrone's consent from the Affidavit without also removing reference to the gun simply does

not alter the probable cause calculus.  The court therefore concludes that Pugh's allegedly false

factual statement regarding Tyrone's consent did not violate Plaintiffs' Fourth Amendment rights

because "the allegedly false statement [was not] necessary to the finding of probable cause."

*Franks*, 438 U.S. at 155-56.  Accordingly, the court will also grant Defendants' Motion as to the

portion of Count II concerning the street search of Tyrone.

### d.   The MPD Officer Defendants' Reliance On The Warrant (Count I)[10]

Plaintiffs allege in Count I of their Amended Complaint that Pugh's Affidavit "utterly

failed to provide any particularized facts linking the home to any criminal activity, let alone to

establish probable cause that the list of specific [gun-related] items sought" by the warrant would

be found there, and that the warrant was therefore "so plainly lacking in probable cause that no

reasonable officer could have relied on it in good faith."  (Am. Compl. ¶ 81).  Consequently,

Plaintiffs contend that the MPD Officer Defendants violated their constitutional rights by relying

on the facially insufficient warrant in executing the search of their home.  (*Id.*).

As discussed above, the court finds that Plaintiffs sufficiently allege that Pugh knew that

his Affidavit contained false statements and material omissions.  Accordingly, the court finds

that Plaintiffs have sufficiently alleged that Officer Pugh could not have reasonably relied on the

warrant.  *See Groh v. Ramirez*, 540 U.S. 551, 564 (2004) ("[B]ecause petitioner himself prepared

the invalid warrant, he may not argue that he reasonably relied on the Magistrate's assurance that

the warrant contained an adequate description of the things to be seized and was therefore

valid.").  The court will therefore deny the Motion as to Count I insofar as it concerns Pugh.

---

[10] Plaintiffs make clear in their supplemental brief that Count I is asserted against all MPD
Officer Defendants.  (Pls.' Supplemental Br. at 10 & n.3).

The question then becomes whether the other MPD Officer Defendants were entitled to rely on the warrant.  The court notes at the outset that it is "incumbent on the officer executing a search warrant to ensure the search is lawfully authorized."  *Groh*, 540 U.S. at 563.  At the same time, courts "have recognized that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and . . . that in such cases those officials – like other officials who act in ways they reasonably believe to be lawful – should not be held personally liable."  *Anderson*, 483 U.S. at 641.  For this reason, "the protection of qualified immunity is available if 'a reasonable officer could have believed that [his or her actions were] lawful, in light of clearly established law and the information the officers possessed.'"  *Youngbey v. March*, 676 F.3d 1114, 1117 (D.C. Cir. 2012) (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999)).

In order for the police to have probable cause to conduct a residential search, a search warrant must fulfill the so-called "nexus requirement," which requires that there be "reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought."  *Zurcher*, 436 U.S. at 556; *see also United States v. Savoy*, 889 F. Supp. 2d 78, 88 (D.D.C. 2012) ("[P]robable cause requires not only a fair probability of criminal activity but also a nexus between that activity and the place to be searched.  In other words, it requires 'a fair probability that contraband or evidence of a crime will be found ***in a particular place***.'") (quoting *Illinois v. Gates*, 462 U.S. 213, 237 (1983)) (emphasis in original).  Accordingly, "probable cause that a particular person possesses contraband is usually not, without more, enough to obtain a warrant to search the person's residence for that contraband."  *United States v. Hopkins*, 128 F. Supp. 2d 1, 5 (D.D.C. 2000).  Instead, there must be "some information [which] links the criminal activity to the defendant's residence."  *Lalor*, 996 F.2d at 1583.

22

In *United States v. Thomas*, 989 F.2d 1252 (D.C. Cir. 1993), the appellant sold drugs to two undercover police officers.  The police then obtained a warrant to search his home.  *Id.* at 1253-54.  The appellant argued that the fruits of the search should have been suppressed because the affidavit in support of the warrant "was inadequate" insofar as "it offered no facts indicating that criminal activity occurred at the house."  *Id.* at 1253.  Indeed, the affidavit's only nexus to the appellant's residence was the affiant officer's generalized averment that, based on his "experience investigating narcotics trafficking, . . . drug dealers frequently keep business records, narcotics, proceeds from sales, and firearms in their houses."  *Id.* at 1254.

The Court rejected the appellant's argument, however, finding that "substantial evidence supported a finding of probable cause to issue the warrant."  *Id.* at 1255.  In so doing, it explicitly held that "observations of illegal activity occurring away from [a] suspect's residence can support a finding of probable cause to issue a search warrant for the residence if there is a reasonable basis to infer from the nature of the illegal activity observed that relevant evidence will be found in the residence."  *Id.* (punctuation marks omitted).  Specifically, the Court found that the affiant officer's generalized averments as to his "experience investigating narcotics trafficking" established the requisite "reasonable basis to infer . . . that relevant evidence will be found in the [appellant's] residence."  *Id.* at 1254-55.  The D.C. Circuit has repeatedly reaffirmed the reasoning in *Thomas* in other cases involving searches of suspected drug traffickers' homes.[11]

---

[11] *See*, *e.g.*, *United States v. Washington*, 775 F.3d 405, 409 (D.C. Cir. 2014) (holding that where "the affidavit points to general practices of drug traffickers" and the affiant-officer's observations, in "his extensive experience in drug enforcement, . . . that drug traffickers rarely keep on their person . . . their entire supply of drugs and instead commonly retain much or most of their drug supply in their home or stash house," the officer executing the warrant authorizing search of drug-trafficker's home "could certainly harbor *Leon*'s 'objectively reasonable belief' that contraband or evidence would be found within"); *United States v. Spencer*, 530 F.3d 1003, 1007 (D.C. Cir. 2008) ("Common experience suggests that drug dealers must mix and measure the merchandise, protect it from competitors, and conceal evidence of their trade – such as drugs, drug paraphernalia, weapons, written records, and cash – in secure locations.  For the vast

*Thomas* concerned essentially the same question that is now before this court, except in the context of drug distribution rather than gun possession.  While Defendants rely heavily on *Thomas*, Plaintiffs address it only once in their three briefs, arguing in a footnote that "this drug-culture precedent is simply not applicable to cases in which a single gun is found on a person in a single incident," and claiming that it relied on the "deeply flawed factual assumption" that drug dealers keep evidence of their drug distribution in their homes.  (Opp'n at 14 n.4).  But while the context may have been different and the Court's "factual assumption" may have been "flawed," *Thomas*'s clear holding – that generalized averments as to "training and experience" can fulfill the nexus requirement so long as "there is a reasonable basis to infer from the nature of the illegal activity observed [away from a residence] that relevant evidence will be found in the residence" – nevertheless presents a profound problem for Plaintiff's qualified immunity argument, in which they bear the burden.  989 F.2d at 1255

In an attempt to carry their burden, Plaintiffs point repeatedly to *United States v. Hopkins*, 128 F. Supp. 2d 1 (D.D.C. 2000), decided seven years after *Thomas*.  In *Hopkins*, the defendant was arrested on the street for carrying a handgun without a license.  Several days later, a police investigator obtained a search warrant for the defendant's residence, averring that the defendant "may have at his home address . . . additional guns, ammunition, gun care and cleaning materials, receipts for guns and related gun materials, reloading equipment, holsters and accessories."  128 F. Supp. 2d at 3.  The investigator "seem[ed] to have based this conclusion on

---

majority of drug dealers, the most convenient location to secure items is the home.  After all, drug dealers don't tend to work out of office buildings.  And no training is required to reach this commonsense conclusion."); *United States v. Johnson*, 437 F.3d 69, 72 (D.C. Cir. 2006) (affidavit to search one of defendant's two residences was sufficient to establish probable cause where it relied on testimony that, "in the affiant's experience, drug dealers frequently keep business records, narcotics, proceeds from sales, and firearms in their houses").

three grounds: his formal training, his on-the-job experience, and [the defendant's] recent gun-related arrest." *Id.* However, the training and experience detailed in the warrant application concerned "the many inferences that . . . normally flow from one's status as ***a narcotics trafficker***," despite the fact that there was "no evidence" that the defendant was "in any way involved in drugs." *Id.* at 7 (emphasis added). Unlike this case, the affidavit in *Hopkins* contained no recitation of the inferences that would normally flow from one's status as ***a gun possessor***. The investigator subsequently explained that "the plethora of drug references in his affidavit" were "likely included by mistake." *Id.*

The court took issue with the affidavit's references to the investigator's narcotics-related training and experience in support of a search warrant for evidence of gun possession. It reviewed the affidavit anew after excising the "superfluous information" regarding narcotics and found that probable cause did not exist because, with the drug references removed, the affidavit merely stated that (i) the defendant had two gun arrests (one in close proximity to his home less than 72 hours earlier), and (ii) the investigator had "participated in over 150 arrests and warrants for narcotics violations, but some unknown number of arrests for firearms and weapons violations." *Id.* The court found that the affidavit failed to satisfy the nexus requirement because, with the references to the investigator's "training and experience" excised, the inference to be drawn "amounted to the following: suspects who are arrested for gun violations twice in fifteen months have illegal guns and related accessories in their home." *Id.* In the court's view, this was "not enough to support a finding of probable cause." *Id.*

The court in *Hopkins* also found that while "the world of drugs has its own unique culture, . . . [o]utside the distinctive drug culture . . . behavior is much less uniform and inferences are correspondingly tougher to draw." *Id.* at 5-6. It then specifically addressed how drug trafficking culture differs from gun possession culture:

>Unlike the drug culture, the incidence of gun possession is not so highly identified with a particular pattern of behavior.  While drug dealers usually require a place to store their inventory, gun owners can (and often do) carry their entire artillery – often a single pistol – with them at any one time.  People who have a gun rarely need to make repeated purchases of a gun, and rarely run a gun distribution network out of their home.  Of course, this could be true in any one case, but the affidavit in the instant case is devoid of any reconnaissance information that would lead one to think such circumstances were afoot.  ***The affidavit might have, for example, explained . . . that owners who possess guns like Hopkins' gun usually possess a collection of attachments and paraphernalia, and that these attachments are usually kept at that owners' residence.***[12]  But the affidavit did none of this; and it is unreasonable for a magistrate to infer these or other similar circumstances from two gun arrests over a fifteen month period.

*Id.* at 7-8 (emphasis added).

The court then turned to the question of whether the *Leon* "good faith" exception applied, and concluded that it did, even though the challenged affidavit made no reference to any training or experience concerning the tendency of gun possessors to keep evidence of their gun possession in their homes:

>Looking at all the circumstances in the instant case, the Court finds that the warrant, even if unsupported by probable cause, was executed in good faith by the law enforcement officers. . . .  ***In executing the warrant, the officers made an assumption.  They assumed that one who has a past of carrying guns, and has just recently carried a gun near his home is likely to have gun paraphernalia in his home.  As the Court explained above, this is not enough to establish probable cause.  But it is enough to show that the officers were acting in good faith.  Their conclusion was not illogical, just weakly supported.***  Law enforcement officers in areas such as the District of Columbia are no doubt familiar with many individuals who, after several arrests, continue to violate the law.  It is not absurd to think that the defendant in this case might be one of those people.  ***Thus, although the officers may have acted prematurely or even somewhat overzealously, the court cannot say that they acted in an entirely unreasonable manner.***

*Id.* at 9-10 (emphasis added).

---

[12] In the instant case, Pugh's Affidavit ***does*** state that, based on his training and experience, gun possessors "usually possess a collection of attachments and paraphernalia, and that these attachments are usually kept at" their residences.  *Hopkins*, 128 F. Supp. 2d at 8.  Plaintiffs do not address this important distinction between *Hopkins* and the instant case anywhere in their briefing.

Based on *Thomas*, its progeny in this Circuit, and the district court's reasoning in *Hopkins*, the court finds it to be a close question whether Pugh's averments as to his "training and experience" sufficed to establish probable cause for the other MPD Officer Defendants to believe that evidence of Tyrone's gun possession was likely to be found in Plaintiffs' home.  In light of the four considerations set forth below, however, the court finds that it is at least arguable that the non-affiant MPD Officer Defendants could have reasonably believed that the warrant at issue in this case was supported by probable cause.  Given the posture of this case, the court need go no further than that to conclude that the non-affiant MPD Officer Defendants are entitled to qualified immunity.  *See Wesby*, 2016 WL 482910, at *5 ("if the facts in the record could at least arguably give rise to probable cause, the defendants would be entitled to qualified immunity") (citing *Hunter*, 502 U.S. at 227; *Wardlaw*, 1 F.3d at 1304).

First, and most importantly, the D.C. Circuit has made clear that "observations of illegal activity occurring away from [a] suspect's residence can support a finding of probable cause to issue a search warrant for the residence." *Thomas*, 989 F.2d at 1255 (punctuation marks omitted).  Officer Pugh's averments as to his "training and experience" essentially mirror the averments that passed constitutional muster in *Thomas* and its progeny, save for the fact that the predicate charge here was gun possession instead of drug distribution.  But if generalized averments as to an officer's "training and experience" regarding the habits and tendencies of drug dealers can provide a reasonable basis to infer that evidence of drug distribution will be found in an alleged drug dealer's residence, then it stands to reason that substantially similar averments as to an officer's "training and experience" regarding the habits and tendencies of gun possessors should provide a reasonable basis to infer that evidence of gun possession will be found in an alleged gun owner's residence.

And even if the different predicate crimes warranted different probable cause determinations because of the "unique culture" of drug trafficking, it is difficult to see how a police officer tasked with carrying out the search in this case could be expected to draw a distinction between constitutionally valid "training and experience" searches for drug-related evidence and the "training and experience" search for gun-related evidence at issue here.  *See*, *e.g.*, *Brinegar*, 338 U.S. at 175 ("In dealing with probable cause . . . as the very name implies, we deal with probabilities.  These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.").  In the court's view, an officer who fails to make such a distinction is not necessarily "plainly incompetent" or "knowingly violat[ing] the law."  *Malley*, 475 U.S. at 341.  Thus, at a minimum, while *Thomas* is factually distinct from this case, the court is guided by *Thomas* in finding that the non-affiant MPD Officer Defendants' reliance on the warrant at issue here was not so unreasonable as to let fall the shield of qualified immunity.

Second, while there is ample D.C. Circuit precedent finding that "training and experience"-based warrants can establish probable cause to search the homes of suspected drug traffickers, *Hopkins* is the only in-Circuit case of which the court is aware that applies those principles to the gun possession context.  And while the court in *Hopkins* found that there was no probable cause, the applicability of that holding to this case is cast into doubt by the fact that the *Hopkins* affiant's averments regarding his "training and experience" were read out of the warrant application because of what was essentially a scrivener's error.  The fact that the court rejected a warrant application from which all references to "training and experience" had been excised would therefore appear to have little bearing on the question of whether the Affidavit at issue in this case established probable cause, or at least came close enough that the non-affiant MPD Officer Defendants would still be protected by qualified immunity.

Third, the court in *Hopkins* strongly indicated that the result would have been different had the affidavit stated that gun possessors "usually possess a collection of attachments and paraphernalia, and that these attachments are usually kept at that owners' residence."  128 F. Supp. 2d at 8.  Plaintiffs do not address this important caveat, and they ignore the fact that the Affidavit at issue here – probably not by coincidence – contains exactly the kind of averments that were explicitly flagged as missing in *Hopkins*.  (Warrant at 2-3).  This important distinction between *Hopkins* and the instant case significantly undermines Plaintiffs' claim that "[i]f the warrant application in *Hopkins* fell far short of providing probable cause, the warrant application in this case was worse."  (Opp'n at 11) (quotation omitted).

Fourth, despite the lack of any averments regarding gun-related "training and experience," the court in *Hopkins* nevertheless found that the assumption that "one who has a past of carrying guns, and has just recently carried a gun near his home is likely to have gun paraphernalia in his home . . . was not illogical."  128 F. Supp. 2d at 10.  Accordingly, it concluded that the officers executing the warrant had not "acted in an entirely unreasonable manner" and were, in fact, "acting in good faith," such that the good faith exception would apply.  *Id.*  Given that finding, it is difficult to see how Plaintiffs can rely on *Hopkins* to argue that the non-affiant MPD Officer Defendants were "plainly incompetent" or "knowingly violat[ed] the law" here, such that they would not be entitled to qualified immunity.  *See Malley*, 475 U.S. at 341.

While these four considerations suffice to establish that the non-affiant MPD Officer Defendants at least arguably had probable cause and are therefore entitled to qualified immunity, the court pauses to note its concern that the D.C. Circuit's holdings in *Thomas* and its progeny may run the risk of swallowing the nexus requirement whole.  To wit, these cases appear, in practice if not in theory, to permit generalized, boilerplate averments regarding an officer's

"training and experience" in dealing with broad classes of suspects grouped together on the basis of their alleged criminal conduct to stand in for particularized facts about a specific suspect, his or her specific conduct, and his or her specific residence when a search warrant is sought for that residence.  In the court's view, the judicial sanctioning of such thinly supported home searches comes dangerously close to obviating the requirement that a search warrant affidavit "must suggest that there is reasonable cause to believe that the specific things to be searched for and seized are located on the property to which entry is sought ***and not merely that the owner of property is suspected of [a] crime***," *United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006) (emphasis added), and threatens to turn every "street arrest into an automatic raid and search of a home," as Plaintiffs contend.  (Am. Compl. ¶ 36).

Indeed, Plaintiffs' allegations, if true, indicate that the use of "training and experience"-based warrants by the MPD has run amok.  For example, Plaintiffs allege that, in the one-year period surrounding the execution of the search warrant at issue in this case, MPD officers obtained warrants to search at least 56 homes on the basis of having found firearms on a resident of the home during a street stop and their "training and experience," but without presenting any other evidence linking the home to any criminal activity, and that the vast majority of these searches turned up no evidence of gun possession.  (*Id.* ¶¶ 4b, 29-30, 40).  Plaintiffs also allege that MPD officers use averments as to their "training and experience" to take entirely contradictory positions in different search warrant applications.  For instance, Plaintiffs allege that MPD officers have averred ***both*** that "almost never are bullets sold loose or individually in Washington, D.C.," ***and*** that "there are often places where you can buy loose bullets or individual bullets from other gun possessors."  (*Id.* ¶ 18 n.2) (emphasis removed).  Additionally, Plaintiffs allege that, contrary to the averments in this case, MPD officers have cited their "training and experience" in swearing "to different Superior Court judges in other search warrant

applications, before and after the application in this case, that illegal gun possessors in the District commonly stash their firearms and accessories in safe places that are ***not*** their home." (*Id.* ¶ 34) (emphasis in original).

In short, Plaintiffs allege that MPD officers use averments regarding their "training and experience" as a talismanic invocation to convert street arrests into home searches. Such conduct, in the court's view, makes a mockery of the nexus requirement, and of the concept of probable cause, more generally. However, *Thomas* and its progeny remain the applicable precedent by which the court is bound. Those cases, as well as the aforementioned distinctions between the instant case and *Hopkins,* and the heavy burden for overcoming qualified immunity, constrain the court in its analysis of whether the non-affiant MPD Officer Defendants were entitled to rely on the warrant at issue here. Accordingly, the court will grant Defendants' Motion to dismiss Count I as to the non-affiant MPD Officer Defendants.

e. The Manner In Which The Search Was Conducted (Counts V, VI & VII)

Plaintiffs allege that the manner in which the search of their home was conducted violated their rights under both the Fourth and Fifth Amendments. The court first addresses the knock-and-announce claims asserted by Plaintiffs in Counts V and VI. The court will then address each of the three specific violations of the Fourth Amendment alleged by Plaintiffs in Count VII – the cavity search of Michael, the search for drugs, and the handcuffing of Plaintiffs during the search. Finally, the court will address the Fifth Amendment claim in Count VII.

i. *The Failure To Knock And Announce (Fourth Amendment) (Count V)*

The Fourth Amendment "incorporates the common-law requirement that police officers entering a dwelling must knock on the door and announce their identity and purpose before attempting forcible entry." *Richards v. Wisconsin*, 520 U.S. 385, 387 (1997) (citation omitted); *see also Hudson v. Michigan*, 547 U.S. 586, 589 (2006) (describing the common law principle as

"ancient").  This rule protects against personal injury that may result from violence by a surprised resident and the destruction of property caused by the forced entry, and it preserves "those elements of privacy and dignity that can be destroyed by a sudden entrance."  *Hudson*, 547 U.S. at 594 (citations omitted).  "These interests are not inconsequential."  *Richards*, 520 U.S. at 393 n.5.

The knock-and-announce requirement is not inviolate, however.  The Supreme Court has recognized that it can "give way 'under circumstances presenting a threat of physical violence,' or 'where police officers have reason to believe that evidence would likely be destroyed if advance notice were given.'"  *Id.* at 391 (quoting *Wilson v. Arkansas*, 514 U.S. 927, 936 (1995)).  Thus, "[i]n order to justify a 'no-knock' entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence."  *Id.* at 394.

Defendants argue that the MPD Officer Defendants' no-knock entry into Plaintiffs' apartment was justified by five factors, all of which fall under the umbrella of the "officer safety" exception to the knock and announce requirement: (i) there had been reports of an individual armed with a gun frequenting the area; (ii) a resident of the apartment had been found in possession of a gun; (iii) the area had large amounts of street robberies involving guns; (iv) Officer Pugh's stated belief that firearms were likely inside the apartment; and (v) Officer Pugh's stated belief that ammunition was likely inside the apartment.  (Mot. at 14-15; Reply at 6-8).  The court finds Defendants' argument unavailing.

First and foremost, Tyrone – the resident of the apartment who had been found in possession of the gun, and who was by all indications the armed individual who had reportedly been frequenting the area – ***was already in custody at the time of the search***.  Accordingly,

Defendants' invocation of safety concerns arising from Tyrone's criminal conduct cannot justify the MPD Officer Defendants' no-knock entry, as the officers knew that Tyrone was already in custody and had no information indicating that the apartment's other residents had any violent or criminal propensities.

Moreover, Defendants' claim that concern for officer safety justified the no-knock entry is belied by the fact that, three days before the execution of the search warrant, a uniformed MPD officer went to the apartment and was met at the door – presumably after knocking on it – by the frail, disabled Patrice. (Warrant at 4). The officer spoke with Patrice, who appears to have been fully cooperative in answering the officer's questions. (*Id.*). Furthermore, the officer's encounter with Patrice was detailed in the Affidavit for all of the MPD Officer Defendants to see. (*Id.*). This pre-search police visit demonstrates that the MPD considered it safe to send a single uniformed officer to knock on the apartment's door on the same day Tyrone was arrested, and there is nothing to indicate that there was a change in circumstances over the ensuing three days, particularly in light of the fact that Tyrone remained in custody and the officer who visited the apartment was aware that one of its residents was a frail, disabled woman.

In fact, this case closely resembles *Gould v. Davis*, 165 F.3d 265 (4th Cir. 1998), discussed by Plaintiffs in their supplemental brief. (Pls.' Supplemental Br. at 6). In *Gould*, police officers obtained a no-knock warrant for a father's house after his son had been arrested as a suspect in a series of robberies. *See* 165 F.3d at 267. The warrant was based on the son's getaway driver's statement to police "that after some of the robberies he drove [the son] to his father's house," where the son "frequently stayed." *Id.* at 267-68. "The officers believed that the seriousness of the crime of which [the son] was accused, and the fact that the officers sought to recover two handguns, justified a departure from the 'knock and announce' requirement in executing a warrant at [the father's] home," despite the fact that the son was already in custody.

*Id.* at 268.  A magistrate judge agreed and, with a no-knock warrant in hand, "the officers smashed the front door of [the father's] home by means of a battering ram and forcibly entered with their weapons drawn without first knocking or otherwise announcing their presence."  *Id.*

The Fourth Circuit held that "it would have been 'sufficiently clear' and 'apparent' to a reasonable officer . . . that failure to knock and announce prior to entering [the father's] home could only be justified by a fear for officer safety or a fear that the evidence sought in the warrant could be easily destroyed."  *Id.* at 271.  The defendant officers provided "two reasons why they believed they would be in peril in a search of [the father's] home: 1) the crime for which [the son] was being investigated was armed robbery and the search warrant listed two handguns among the items to be seized, and 2) the criminal history of [the father's] children warranted an inference that [the father] might shoot the officers if they knocked and announced their presence before entering."  *Id.*  The Court rejected both arguments.

First, the Court found that the mere fact that guns were sought was insufficient to justify the failure to knock and announce because, if the officers were correct, the knock and announce requirement "would never apply in the search of anyone's home who legally owned a firearm." *Id.* at 272.  The Court held that "no reasonable officer could have believed" this to be the law, pointing out that "a reasonable officer would have known that guns do not fire themselves, and that a justifiable fear for an officer's safety must include a belief, not simply that a gun may be located within a home, but that someone inside the home might be willing to use it."  *Id.*

The Court also declined to accept the officers' reasoning that the father might have been willing to use any guns that might have been inside the home if the officers had knocked and announced their presence prior to executing the search warrant, finding that "any reasonable officer would have rejected as inconsistent with clearly established law" the assumption that a

father "might use a weapon because of the criminal propensities of his children."  *Id.* at 271.

The Court continued:

> If anything is a bedrock principle of our laws, it is that the law treats each of us as
> an individual.  The law cannot abide the notion that a child's behavior can be
> sufficient, by itself, to deprive his father of constitutional rights. . . . [T]he officers
> essentially ask us to hold that a reasonable officer . . . would have believed that a
> parent loses basic, Fourth Amendment protections in his own home when his
> children have been charged in a crime.  We think it obvious that the officers'
> argument cannot be correct.

*Id.*

The court agrees with the Fourth Circuit's analysis, and concludes that no reasonable

officer could have believed that the no-knock entry here was justified by concerns for officer

safety given that (i) the MPD Officer Defendants knew that Tyrone was already in custody at the

time of the search; (ii) an MPD officer had visited the apartment in uniform three days earlier

and was met by a frail, disabled woman who willingly answered questions; (iii) the MPD Officer

Defendants had no reason to believe that Plaintiffs or anyone else inside the apartment had any

violent or criminal propensities; and (iv) the MPD Officer Defendants could not reasonably

impute Tyrone's criminal propensities to those with whom he lived.  Given the facts and

circumstances of this case, the MPD Officer Defendants were not justified in executing the

search warrant without first knocking and announcing their presence.  The court will therefore

deny Defendants' Motion as to Count V.

### ii.   The Failure To Knock And Announce (Negligence Per Se) (Count VI)

Count VI of the Amended Complaint frames the MPD Officer Defendants' failure to

knock and announce as "negligence *per se*."  (Am. Compl. ¶¶ 90-91).  Defendants claim that

Plaintiffs appear to be "relying on D.C. Code § 23-524, which provides that all search warrants

must be executed in compliance with 18 U.S.C. § 3109," which, in turn, imposes a knock-and-

announce requirement.  (Mot. at 18) (citing D.C. Code § 23-524(a)).  Defendants argue that

section 3109 "cannot support negligence *per se* because it is merely a codification of the common law," and "[w]here a statute merely clarifies or defines the duty of care, it does not alter the common law of negligence." (*Id.*) (citing *Perkinson v. Gilbert/Robinson, Inc.*, 821 F.2d 686, 692 (D.C. Cir. 1987)).

Plaintiffs appear to abandon their negligence *per se* argument in a footnote to their opposition brief, where they state that, "[r]egardless of whether the [MPD Officer] Defendants were negligent *per se* or merely negligent, the critical inquiry, as Defendants concede, is whether their conduct was 'reasonable,'" and that "the failure to knock and announce in this case was not reasonable." (Opp'n at 34 n.17). Citing Plaintiffs' apparent abandonment of their negligence *per se* argument, Defendants urge the court to treat it as conceded. (Reply at 1 n.1). Based on the aforementioned footnote and the fact that Plaintiffs do not return to their negligence *per se* argument in their sur-reply or supplemental brief, the court agrees that Plaintiffs have conceded this argument. The court will therefore grant Defendants' Motion as to Count VI, and dismiss it as conceded. *See Baptist Mem'l Hosp.-Golden Triangle v. Leavitt*, 536 F. Supp. 2d 25, 40 (D.D.C. 2008), *aff'd sub nom. Baptist Mem'l Hosp.-Golden Triangle v. Sebelius*, 566 F.3d 226 (D.C. Cir. 2009) ("A Party that fails to refute an opposing party's argument on Summary Judgment may be found to have conceded the point."); LCvR 7(b).

### iii. The Cavity Search Of Michael Pitts (Fourth Amendment) (Count VII)

Plaintiffs allege that the MPD Officer Defendants pulled down Michael's pants, probed his genitals, and subjected him to a humiliating and degrading anal cavity search in front of his mother and partner. (Am. Compl. ¶¶ 1, 61). Plaintiffs argue that the cavity search was patently unreasonable because, among other things, (i) there was no indication that Michael was secreting any of the gun-related items sought in the warrant inside his anal cavity while he was cooking dinner for his family (Opp'n at 35-36); (ii) the search warrant granted authority to search the

apartment, but did not grant authority to search its occupants, despite Officer Pugh having requested such authority in the warrant application (*id.* at 36); and (iii) Michael's mere presence in the apartment at the time of the search was insufficient to create probable cause to conduct such an invasive search.  (Pls.' Supplemental Br. at 6-7).

Defendants contend that the cavity search was reasonable because it was conducted inside the apartment, "which was a private location," and was "intended to find concealed evidence and prevent risks to officer safety."  (Mot. at 16).  Defendants also attempt to extend the "search incident to arrest" doctrine to the cavity search, even though no one was actually arrested.  (*Id.* at 15).

The court will dispense with Defendants' last argument first.  Defendants' attempt to expand the "search incident to arrest" doctrine to encompass cavity searches of individuals who were not actually arrested is unsupported by any legal authority, and the court declines to sanction such an expansion.

Additionally, Defendants do not argue that the MPD Officer Defendants had probable cause to believe that Michael – who was not named as a suspect in the warrant application – had committed any crime or possessed any contraband at the time of the cavity search, and there is nothing in the record that would have given rise to such probable cause.  Moreover, although Pugh had sought permission to search the apartment as well as its occupants, the warrant only permitted the officers to search the premises.  Accordingly, the cavity search cannot be supported by the probable cause determination made by the magistrate judge in issuing the warrant, which applied only to the apartment and not its occupants, or by any probable cause determination that may have been made by the MPD Officer Defendants during the execution of the search warrant, at least given the facts presently before the court.  *See Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) ("[A] person's mere propinquity to others independently suspected of criminal activity does not,

without more, give rise to probable cause to search that person. . . . Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person.  This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be.").

The court also finds Defendants' assertion that the officers searched Michael's anal cavity "to find concealed evidence" to be ludicrous on its face.  It is clear beyond cavil that "search[es] must be limited to the areas where the object of that infraction could be concealed." *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 388-89 (2009) (citing *Horton v. California*, 496 U.S. 128, 141 (1990) ("Police with a warrant for a rifle may search only places where rifles might be.")).  None of the MPD Officer Defendants could have reasonably believed that a man who was in the kitchen cooking dinner would or could have been secreting inside his anal cavity the kinds of evidence sought in the warrant – namely, "illegal firearms, parts of firearms, firearm magazines, ammunition, holsters, gun cleaning kits, gun cases, pictures, papers or other paraphernalia relating to the ownership of a firearm."  (Warrant at 1).  Defendants' contention is made even more absurd by the fact that the officers did not knock and announce their presence, giving Michael no opportunity to hide any such evidence inside his body while cooking dinner.  *See Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1451 (9th Cir. 1991) (body cavity search of a couple deemed unconstitutional where police were searching for a stolen ring, and the couple's "behavior suggest[ed] that they did not anticipate their arrest.").

The court also finds no support for the contention that the cavity search was conducted to "prevent risks to officer safety."  (Mot. at 16).  For the reasons discussed below, in the section of this Memorandum Opinion relating to the handcuffing of Plaintiffs during the pendency of the search at issue in this case, it is clear that, as a general matter, a search warrant for a private

home carries with it the authority to detain the home's occupants during the search.  The question of whether the police may search people who they have detained during a premises search out of concern for police safety is far from settled, however.  *See, e.g.*, *Germany v. United States*, 984 A.2d 1217, 1227 (D.C. 2009) (analyzing *Terry v. Ohio*, 392 U.S. 1 (1968), and its progeny as pointing "toward a recognition that an individual's apparent association with a residence that police have been authorized to search for weapons is a circumstance that, along with the rest of the totality of circumstances, may provide a reasonable articulable basis for police to frisk the individual for weapons when they find him on the premises when they arrive to execute the search warrant").  But while frisking Michael or patting him down during the pendency of the home search at issue here may have passed constitutional muster, the facts as alleged by Plaintiffs indicate that the cavity search was far from the kind of protective search that could have been justified by concerns for officer safety.  It is simply unreasonable to believe that concerns for officer safety could have warranted a search of Michael's anal cavity, especially since he was already handcuffed when the cavity search was conducted, rendering any theoretical weapons that he may have been secreting in his anal cavity presumptively out of his reach, and considering the MPD Officer Defendants' failure to knock and announce.

The court also considers the privacy and dignity interests implicated by the alleged cavity search.  In *United States v. Cameron*, 538 F.2d 254, 258 (9th Cir. 1976), the Ninth Circuit explained that a person subjected to a cavity search is "faced with the real prospect that the most intimate portions of his anatomy will be invaded and that he will suffer resulting pain or even physical harm."  The Court held that for such searches "to comport with the reasonableness standard of the fourth amendment, [they] must be conducted with regard for the subject's privacy and be designed to minimize emotional and physical trauma."  *Id.*  It further clarified that "[i]n a situation thus laden with the potential for fear and anxiety, a reasonable search will include,

beyond the usual procedural requirements, reasonable steps to mitigate the anxiety, discomfort, and humiliation that the suspect may suffer." *Id.*

Similarly, in *Evans v. Stephens*, 407 F.3d 1272 (11th Cir. 2005), the Eleventh Circuit denied qualified immunity to officers who had conducted strip searches in an abusive manner, including, among other things, by conducting them in places capable of heightening the subject's fear, using unnecessary force, threatening and ridiculing the search subjects, and penetrating the subjects with foreign objects in view of each other. The Court found that the constitutional "violation was obvious":

> Every objectively reasonable officer would have known that, when conducting a strip search, it is unreasonable to do so in the manner demonstrated by the sum of the facts alleged by Plaintiffs. The totality of the facts alleged here made this violation – on the day of the search – clear from the terms of the Constitution itself: No objectively reasonable policeman could have believed that the degrading and forceful manner of this strip search . . . was "reasonable" in the constitutional sense.

*Id.* at 1283.

It is also clear that strip and/or cavity searches must also be conducted in private. *See, e.g.*, *Campbell v. Miller*, 499 F.3d 711 (7th Cir. 2007) (strip search for drugs including visual anal examination conducted in back yard in view of other homes was unreasonable in its execution); *Del Raine v. Williford*, 32 F.3d 1024 (7th Cir. 1994) (digital rectal search of an inmate conducted outside a private examination room cognizable under Fourth Amendment); *Polk v. Montgomery County, Md.*, 782 F.2d 1196, 1201 (4th Cir. 1986) (fact that visual body cavity inspection of pretrial detainee may have been performed in the presence of other detainees is especially relevant in determining validity of the search); *Hill v. Bogans*, 735 F.2d 391 (10th Cir. 1984) (impermissible for jail to allow routine strip searches in public area of persons detained for minor traffic offenses); *Iskander v. Village of Forest Park*, 690 F.2d 126, 129 (7th Cir. 1982) (strip searches conducted in public view are *per se* unreasonable); *Logan v. Shealy*,

660 F.2d 1007, 1014 (4th Cir. 1981) (court invalidated strip search of detainee in police holding cell with broken or open window blinds, finding "[a]s a matter of law, no police officer in this day and time could reasonably believe that conducting a strip search in an area exposed to the general view of persons known to be in the vicinity – whether or not any actually viewed the search – is . . . constitutionally valid").

Simply put, the cavity search alleged in this case appears to have been designed to *increase* Michael's humiliation and emotional trauma, rather than to decrease it. After bursting through the front door of the apartment, the MPD Officer Defendants took Michael from the kitchen, where he was preparing dinner, to the living room, where his mother and partner were handcuffed, in order to perform the cavity search. Thus, rather than attempt to protect Michael's privacy, the MPD Officer Defendants went out of their way to violate it. Defendants' claim that the search was somehow done "in private" because the home itself was a private place is absurd, and ignores the fact that the humiliating cavity search is alleged to have been performed directly in front of Michael's own mother and partner – hardly the kind of "privacy" that is required for such an invasive and embarrassing procedure.

The court therefore finds that the MPD Officer Defendants could not have reasonably believed that, under the facts and circumstances alleged here, there was any legitimate basis for searching Michael's anal cavity in front of his mother and partner. Accordingly, the court will deny Defendants' Motion as to Count VII insofar as it relates to the alleged cavity search.

### *iv.   The Extended Search For Drugs (Fourth Amendment) (Count VII)*

Plaintiffs' allege that the MPD Officer Defendants conducted an unlawful search of the Pitts home and its occupants for drugs despite the fact that the warrant authorized only a premises search for "firearms and related accessories." (Am. Compl. ¶ 93). Plaintiffs also allege that "Defendants repeatedly shouted at [Michael] that they knew that he had drugs in the home

and numerous times demanded that he show them where they could find drugs in his apartment"
(*id.* ¶ 66), and that they "threatened Michael . . . that, if he did not tell them where the drugs
were, his partner would go to jail" (*id.* ¶ 73).

     The Supreme Court has made clear that courts must evaluate officers' conduct under the
Fourth Amendment objectively, not subjectively. *See Horton*, 496 U.S. at 138 ("[E]venhanded
law enforcement is best achieved by the application of objective standards of conduct, rather
than standards that depend upon the subjective state of mind of the officer."); *see also Whren v.
United States*, 517 U.S. 806, 814 (1996) ("[T]he Fourth Amendment's concern with
'reasonableness' allows certain actions to be taken in certain circumstances, **whatever** the
subjective intent.") (emphasis in original).  Thus, in this case, the MPD Officer Defendants'
"actual motives" for searching for drugs while executing a search warrant for guns and gun-
related items are "not relevant as long as [their] actions were objectively reasonable." *United
States v. Christian*, 187 F.3d 663, 670 (D.C. Cir. 1999).

     The Supreme Court has held, however, that "the reasonableness of a search's scope
depends only on whether it is limited to the area that is capable of concealing the object of the
search." *Redding*, 557 U.S. at 388-89 (citing *Wyoming v. Houghton*, 526 U.S. 295, 307 (1999)
(police officers "may inspect passengers' belongings found in the car that are capable of
concealing the object of the search"); *Florida v. Jimeno*, 500 U.S. 248, 251 (1991) ("The scope
of a search is generally defined by its expressed object."); *United States v. Ross*, 456 U.S. 798,
820 (1982) ("A lawful search . . . generally extends to the entire area in which the object of the
search may be found.")); *cf. United States v. Johns*, 469 U.S. 478, 487 (1985) (search found
reasonable because "there is no plausible argument that the object of the search could not have
been concealed in the packages").  "In keeping with this longstanding rule, . . . the search must
be limited to the areas where the object of that infraction could be concealed." *Id.* (citing

*Horton*, 496 U.S. at 141 ("Police with a warrant for a rifle may search only places where rifles might be") (quotation omitted); *Ross*, 456 U.S. at 824 ("[P]robable cause to believe that undocumented aliens are being transported in a van will not justify a warrantless search of a suitcase")).  Accordingly, the question before the court is not simply whether the MPD Officer Defendants were also looking for drugs while executing the search warrant, as such a question would go only to the officers' subjective state of mind.  Rather, the question is whether the MPD Officer Defendants searched for drugs ***in places within the apartment where they could not have reasonably expected to find guns and gun-related items***, as that would indicate that the officers' objective conduct went beyond the scope of the warrant.

Plaintiffs allege that the MPD Officer Defendants would not have searched inside Michael's anal cavity nor put their hands into the food that he had been preparing had they not been searching for drugs.  (Am. Compl. ¶ 93) ("The MPD [O]fficer[ Defendants] raiding the home unlawfully searched the home and its occupants – including a humiliating and unjustified strip search of Mr. Pitts's genitals and anal cavity and a search of the hot food that he had just prepared for the family – for drugs even though the warrant explicitly authorized only a search for firearms and related accessories.").  This allegation is supported by common sense – while no objectively reasonable police officer could expect to find guns or gun paraphernalia in Michael's anal cavity or the dinner he was preparing for his family because of the size and nature of such items, an officer could at least conceivably expect to find drugs there.  Because Plaintiffs have pleaded facts sufficient to establish that the MPD Officer Defendants expanded the physical scope of their search to encompass locations within the apartment where they would not have reasonably expected to find the gun-related items described in the warrant, but where they could have at least conceivably expected to find drugs, the court will deny Defendants' Motion as to Count VII insofar as it relates to the alleged search for drugs.

*v.   Handcuffing Plaintiffs Without Justification (Fourth Amendment) (Count VII)*

Plaintiffs claim that the MPD Officer Defendants violated their Fourth Amendment rights by handcuffing them during the search despite the fact that the officers had no reason to believe that they had committed any crime or posed any threat, and despite the fact that Patrice is frail and disabled.  (Am. Compl. ¶ 93).

In *Michigan v. Summers*, 452 U.S. 692, 693 (1981), police officers encountered Summers descending the front steps of his home as they arrived to execute a search warrant for drugs.  The officers detained him while they searched the premises.  *Id.*  After finding drugs in the house and determining that Summers owned the house, the officers arrested and searched him, finding heroin in his coat pocket.  *Id.*  Summers moved to suppress the heroin as the product of an unlawful seizure, but the Supreme Court upheld the detention and search, finding that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted."  *Id.* at 705.  The Court recognized that although "no special danger to the police is suggested by the evidence in this record, the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence."  *Id.* at 702.  The Court reasoned that because "a neutral magistrate rather than an officer in the field . . . made the critical determination that the police should be given a special authorization to thrust themselves into the privacy of the home," the "connection of an occupant to that home gives the police officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant."  *Id.* at 703-04.

In *Muehler v. Mena*, 544 U.S. 93 (2005), police officers investigating a gang-related drive-by shooting obtained a search warrant for a location believed to be the residence of one of the gang members involved in the shooting.  544 U.S. at 95-96.  The warrant authorized a search

of the house and premises for, among other things, deadly weapons.  *Id.* at 95.  The team of agents who conducted the search detained Mena and three other individuals found on the property for the duration of the search, handcuffing them and taking them into a converted garage on the premises.  *Id.* at 96.

The Court found that the detention was lawful, explaining that *Summers* had established "that officers executing a search warrant for contraband have the authority to detain the occupants of the premises while a proper search is conducted . . . because the character of the additional intrusion caused by detention is slight and because the justifications for detention are substantial" – namely, "preventing flight in the event that incriminating evidence is found; minimizing the risk of harm to the officers; and facilitating the orderly completion of the search." *Id.* at 98 (citation and quotations omitted).  In no uncertain terms, the Court described "[a]n officer's authority to detain incident to a search" as "categorical," in that "it does not depend on the quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure." *Id.* (citation and quotation omitted).  It therefore concluded that "Mena's detention for the duration of the search was reasonable under *Summers*" simply because there was a warrant to search the address where she was an occupant.  *Id.*; *see also Bailey v. United States*, 133 S. Ct. 1031, 1041-43 (2013) ("*Summers* recognized that a rule permitting the detention of occupants on the premises during the execution of a search warrant, even absent individualized suspicion, was reasonable and necessary in light of the law enforcement interests in conducting a safe and efficient search. . . . Detentions incident to the execution of a search warrant are reasonable under the Fourth Amendment because the limited intrusion on personal liberty is outweighed by the special law enforcement interests at stake.").

Additionally, the Court found that the officers' "use of force in the form of handcuffs to effectuate Mena's detention" was reasonable and lawful for the same reason that the detention

was reasonable and lawful – "because the governmental interests outweigh the marginal

intrusion." 544 U.S. at 99 (citation omitted).  While noting that *Summers* "stressed that the risk

of harm to officers and occupants is minimized if the officers routinely exercise unquestioned

command of the situation," the Court acknowledged that handcuffing an individual "who was

already being lawfully detained during a search of the house was undoubtedly a separate

intrusion in addition to detention."  *Id.* at 99 (citations and quotations omitted).  The Court

concluded, however, that "this was no ordinary search":

> The governmental interests in not only detaining, but using handcuffs, are at their
> maximum when, as here, a warrant authorizes a search for weapons and a wanted
> gang member resides on the premises.  In such inherently dangerous situations, the
> use of handcuffs minimizes the risk of harm to both officers and occupants.  Though
> this safety risk inherent in executing a search warrant for weapons was sufficient to
> justify the use of handcuffs, the need to detain multiple occupants made the use of
> handcuffs all the more reasonable.

*Id.* at 100 (citations omitted).  The Court also acknowledged "the fact that the warrant did not

include Mena as a suspect," just as Plaintiffs were not named as suspects in the Affidavit here,

but deemed that fact irrelevant because "[t]he warrant was concerned not with individuals but

with locations and property," and because "*Summers* makes clear that when a neutral magistrate

has determined police have probable cause to believe contraband exists, the connection of an

occupant to a home alone justifies a detention of that occupant."  *Id.* at 99 n.2 (citations,

quotations and alterations omitted).

More recently, in *United States v. Brinson-Scott*, 714 F.3d 616 (D.C. Cir. 2013), police

officers executed a search warrant at the home of an individual who had been arrested for gun

possession.  That individual's brother was the sole occupant of the home at the time of the

search.  *See* 714 F.3d at 619.  The officers handcuffed him, ordered him to sit in the living room,

and told him that he was not under arrest, but was being detained to ensure the officers' safety

during the search.  *See id.*  The D.C. Circuit, citing *Summers* and *Mena,* found that the detention

was "undoubtedly lawful under the Fourth Amendment."  *Id.* at 621.

Although the facts in this case are in some ways different from those in *Mena* and

*Brinson-Scott*, they are sufficiently similar for the court to find that the MPD Defendants' actions

in handcuffing and detaining the occupants of the Pitts home did not violate the Fourth

Amendment, particularly given that the need to ensure the officers' safety was heightened in

light of the fact that they were searching for guns and gun-related accessories.  *See Mena* 544

U.S. at 100.  The court therefore finds that Plaintiffs have not pleaded sufficient facts to establish

that the MPD Officer Defendants violated the Fourth Amendment by handcuffing them during

their execution of the search warrant, and will grant Defendants' Motion as to Count VII insofar

as it relates to the handcuffing.

### vi.   The Overall Conduct Of The Search (Fifth Amendment) (Count VII)

Plaintiffs allege that the conduct of the search shocks the conscience and violates the

Fifth Amendment, and that the Due Process Clause protects citizens from the police conduct

alleged here.  It is well-settled, however, that "[w]here a particular Amendment 'provides an

explicit textual source of constitutional protection' against a particular sort of government

behavior, 'that Amendment, not the more generalized notion of 'substantive due process,' must

be the guide for analyzing [a party's] claims."  *Albright v. Oliver*, 510 U.S. 266, 273 (1994)

(quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).  Because the Fourth Amendment

governs the search at issue in this case, any constitutional harm arising from the search is

governed exclusively by the Fourth Amendment.  *See Elkins v. District of Columbia*, 690 F.3d

554, 562 (D.C. Cir. 2012) (holding that plaintiff could not "use the search of her home or the

seizure of documents as grounds for a claim under the Fifth Amendment" because "[t]he remedy

for any harm to [plaintiff] from the search of her home is governed by the Fourth Amendment").

The court will therefore grant Defendants' Motion as to the Fifth Amendment claim in Count VII, and dismiss that claim as a matter of law.

## IV.    CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss is hereby **GRANTED IN PART and DENIED IN PART.**

The court hereby **GRANTS** the Motion as to (i) the portion of Count I concerning MPD Officer Defendants other than Mark Pugh; (ii) the portion of Count II concerning the street search of Tyrone; (iii) Counts III and VI in their entirety; (iv) the Fourth Amendment claim in Count VII concerning the handcuffing of Plaintiffs during the search; and (v) the Fifth Amendment claim in Count VII.

The court hereby **DENIES** the Motion as to (i) the portion of Count I concerning MPD Officer Defendant Mark Pugh; (ii) the portion of Count II concerning Pugh obtaining the search warrant based on false and misleading statements and omissions other than those concerning the street search of Tyrone; (iii) Counts IV and V in their entirety; and (iv) the Fourth Amendment claims in Count VII concerning the cavity search and the search for drugs.

An appropriate Order accompanies this Memorandum Opinion.


Date:  March 31, 2016


*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge